David NELSON, Katie Nelson, Matthew Rogerson and Lisa Ward, Plaintiffs,

v.

MOLINE SCHOOL DISTRICT NO. 40, Richard Hennegan, Superintendent of Moline School District, and Keith Schwab, Principal of Moline High School, Defendants.

No. 87–4143.

United States District Court, C.D. Illinois.

Sept. 19, 1989.

On Reserved Issues Oct. 25, 1989.

966

Charles E. Hervas, Itasca, Ill., for plaintiffs.

Stanley B. Eisenhammer, Michael R. Grimm, Chicago, Ill., for defendants.

## ORDER

MIHM, District Judge.

Plaintiffs brought this action for declaratory relief, injunctive relief and nominal damages pursuant to 42 U.S.C. §§ 1983 and 1988, alleging deprivation of their First Amendment rights. Pending before the Court are Cross–Motions for Summary Judgment. For the reasons stated below, Plaintiffs' Motion for Summary Judgment is denied to the extent it challenges the regulation in effect at the present time; Defendants' Motion for Summary Judgment is granted as to the existing regulation and reserved as to the previous regulation.

The Court recognizes the parties' concerns over this lawsuit as a whole. However, because another school year has begun, the Court felt it was necessary first to address the questions regarding the present regulation. The parties may rest assured that the balance of the Motions will be decided as quickly as possible.

## BACKGROUND

At the time of the events discussed herein, the four Plaintiffs were students at Moline High School. Keith Schwab had been the school principal for four years, serving as the chief supervisory and administrative officer of the school building. Mary Foster was the associate school principal.

On October 19, 1987, Schwab was in Chicago attending a meeting, and Mary Foster was acting principal. On that day, three of the Plaintiffs passed out copies of a non-denominational religious publication entitled *Issues and Answers* in school hallways before classes began. According to one of the Plaintiffs, another student reported to a hall monitor that the paper was being distributed, and the monitor informed Foster. Foster called Plaintiff David Nelson into her office during the middle of the first class period, looked over the magazine and told him that it was her understanding that he could not distribute it at school.

The Plaintiffs made no further attempts to distribute additional copies of the publication until mid-November. No disciplinary action was taken against any of the Plaintiffs for the October 19 incident.

Subsequently, Foster informed Schwab about the incident and told him that she had asked David Nelson to stop distributing the paper. Schwab took no immediate action.

On November 18, 1987, Schwab announced over the school intercom the new school policy regarding distribution of fliers, announcements and papers. The policy provided that:

> Students are not allowed to distribute fliers, announcements, or papers of any kind without approval by the school administration. If approved by the principal, handouts will be made available for students. Please check in the main office to leave any materials to be reviewed for approval.

The next day, Plaintiffs went to Schwab's office to discuss distribution of the new monthly *Issues and Answers*. Schwab looked at the only copy of *Issues and Answers* that the students had brought with them. He told them that he had no objection to the materials and that they could leave the material in his office for distribution. Plaintiff David Nelson replied that they only had one copy with them and would bring more the next day. Schwab then asked if they would like a written announcement for the student bulletin, and David Nelson replied that they would. Schwab told the students to write an announcement and he would make certain it was announced over the public address system. The students voiced no objection to this procedure.

However, the students never brought an announcement to be read or material to be distributed. According to one of the students, they decided not to leave the materials in the office because they were afraid not as many people would get copies; instead, the students personally distributed copies of *Issues and Answers* in the halls. The students were not disciplined for distributing these newspapers.

On November 24, 1987, Schwab announced a newly developed, written policy

regarding distribution of non-school related materials. The policy provided:

Students seeking to distribute non-school materials to the student body shall provide a copy of the material to the principal or the administrator in charge if the principal is unavailable for review. The principal or administrator in charge will approve the distribution within two hours of receipt unless the material is libelous, invades the privacy of others, is obscene or pornographic, is pervasively indecent and vulgar, will cause a material and substantial disruption of the proper and orderly operation of the school or school activities, or advertises a product or services not permitted for use by minors under the law. If the material is approved, the students will be allowed to distribute such material at any entrance or exit to the school both before and after school and at a place near the cafeteria designated by the principal during all lunch periods.

Students shall not distribute materials in a manner which disrupts any school activity or blocks or impedes the safe flow of traffic within corridors and entrance ways of the school. Students who distribute such materials shall be responsible for cleaning up such materials thrown on the floors, in the school, or on the grounds outside the school. Additionally, such material may be left in the main office so that other students may obtain a copy during the school day.

Since the new policy was implemented, Plaintiffs have submitted copies of *Issues and Answers* to the office for approval each month. In each case the administrator in charge has reviewed and approved the issue presented, and the students have distributed copies at the designated times and locations. There is no evidence of anything disruptive in the distribution of *Issues and Answers* other than litter resulting from copies of *Issues and Answers* being tossed on the floor. Approximately 200 total copies have been distributed each month.

Plaintiffs filed a Complaint on December 14, 1987 alleging that the unwritten policy,

the interim policy and the newly formulated policy all violate their First Amendment rights. In June 1989 Cross–Motions for Summary Judgment were filed to which responses and a reply were made. A hearing was held on August 25, 1989, at which time the parties were ordered to submit further pleadings regarding the school's policies which pre-dated the written policy now in effect. This order only concerns the existing policy; to the extent that the summary judgment Motions concern the prior policies, the Court reserves judgment.

The Defendants argue that this Court does not need to decide such broad issues as whether or under what circumstances a high school may prohibit distribution of a religious magazine in school, or whether other aspects of the school's policy regulating content on the basis of obscenity, libelousness, or other factors are proper. Rather, according to the Defendants, the only legal issue in dispute is whether the school's regulation as to the time, place and manner of the distribution of this particular magazine were so restrictive as to violate Plaintiffs' constitutional rights. Specifically, Defendants argue that Plaintiffs' Complaint only challenges the prohibition on distribution of the magazine to the student body between classes in the halls and classrooms of the high school during the school day.

Thus, Defendants claim that this Court must determine whether Moline High School's classrooms and halls (when classes are not in progress) are considered a public forum, a limited public forum, or a nonpublic forum with respect to distribution of non-school sponsored material. Depending upon the type of forum, the law regarding regulation of communication varies, as discussed in *Perry Educational Association v. Perry Local Educators Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Defendants argue that during a school day the classrooms and halls are either a non-public forum, in which distribution may be completely prohibited or severely restricted, or a limited public forum, in which reasonable time, place and manner regulations can be enforced. Thus, in either case, none of the Plaintiffs' constitu-

tional rights were violated, according to Defendants. Defendants reject the proposition that the school's classrooms and halls are a public forum.

Plaintiffs argue that under *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), a forum analysis is inappropriate. Instead, students' First Amendment rights may only be limited in matters of curriculum (not involved in this case) and in student communication which "materially and substantially interferes with the requirements of appropriate discipline in the operation of the school."

Plaintiffs claim that the First Amendment offers broad protection for high school students in non-curriculum activities and communications. Because the existing policy at Moline High School amounts to a system of prior restraint and is not founded on any evidence of material disruption caused by the paper's distribution, Plaintiffs argue that the existing policy is unconstitutional.

In addition, Plaintiffs argue that the existing policy is both vague and overbroad. It neither identifies nor defines how the distribution of literary material would cause substantial or material disruption within the school, and it fails to identify any other compelling reason for imposing the current policy; in addition, the policy is not narrowly tailored to prevent a material and substantial disruption. Plaintiffs also claim that the policy is vague in its application and enforcement since it makes no distinction between various types of non-school related material (i.e., notes, periodicals, newspapers, advertisements) and does not include any guidelines for evaluation or enforcement.

A number of other arguments are raised but because of the resolution of the constitutional claims, the Court need not consider those argument as they relate to the existing school policy.

### DISCUSSION

■ Students do not shed their constitutional rights at the schoolhouse gate. *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736.

However, the constitutional rights of students in public schools are not automatically co-extensive with the rights of adults and other settings. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3163–64, 92 L.Ed.2d 549 (1986); *see also, New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Rather, the scope of students' constitutional rights must be determined in light of special characteristics inherent in a school environment. *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736. In three cases the Supreme Court has specifically discussed the First Amendment rights of students in public schools.

In *Tinker*, a small group of students engaged in a protest of the Vietnam War by wearing black armbands to school. The school then adopted a policy that any student wearing the armbands would be asked to remove them; if the student refused to remove the armband, the school would suspend the student until he or she returned with the armband removed. The plaintiffs in the case wore the armbands and, when asked to remove them, refused. They were suspended. The district court held that, while this was indeed protected symbolic speech, the school regulation was reasonable in order to prevent disturbances of school discipline. The Eighth Circuit affirmed without opinion.

The Supreme Court agreed with the district court that the students' conduct was symbolic speech within the parameters of First Amendment rights available to students, noting the tension between the students' First Amendment rights and the authority of states and schools to prescribe conduct and otherwise discipline students. 393 U.S. at 508–09, 89 S.Ct. at 737–38.

The Court disagreed, however, with the lower court's finding that the regulation was reasonable to prevent disturbances of discipline, stating that in First Amendment analysis a general fear of disturbance is not enough to overcome First Amendment rights. Instead, the government must show that the regulation is caused by more than a mere desire to avoid the discomfort and unpleasantness which necessarily ac-

company an unpopular opinion. *Id.* at 509, 89 S.Ct. at 738. If the government can make no showing that the expression feared would materially and substantially interfere with appropriate discipline in the school, then the prohibition cannot be sustained. *Id.* at 515, 89 S.Ct. at 741.

The Court further noted that the school district had not tried to regulate or prohibit all politically symbolic speech or all controversial symbols; instead, the school had narrowed in on one particular opinion (opposition to the war in Vietnam). The Court stated, "Clearly the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with school work or discipline, is not constitutionally permissible." *Id.* at 511, 89 S.Ct. at 739.

In *Bethel School District No. 403 v. Fraser,* a public high school student delivered a speech at a voluntary student government assembly held during school hours. Approximately 600 students attended the assembly. In nominating a fellow student for elective office, the speaker referred to the candidate in terms of an elaborate, graphic and explicit sexual metaphor. Following the assembly, the principal of the school notified the student that his speech was a violation of the schools' disruptive-conduct rule prohibiting conduct that substantially interfered with the educational process, including the use of obscene profane language or gestures. After the student admitted that he had deliberately used sexual innuendo in the speech, the school suspended him for three days and removed his name from the list of candidates for graduation speaker at the school's commencement. The school's disciplinary review process resulted in affirmance of the discipline but allowed the student to return to school after serving only two days of the suspension.

The district court held that the school's sanctions violated the First Amendment in part because the rule was unconstitutionally vague and overbroad. The court of appeals affirmed the district court, holding that the student's speech was indistinguishable from the protest armband in *Tinker.* The court rejected the school district's arguments that the speech had a disruptive effect on the educational process or that the school had an interest in protecting minors from lewd and indecent language in a setting sponsored by the school. In addition, the court of appeals rejected the argument that it had the power to control the language used to express ideas during school sponsored activities.

The Supreme Court reversed, distinguishing the political speech in *Tinker* from the lewd or obscene speech before it. The basis of the distinction, according to the Supreme Court, was that the school regulation before it in *Fraser* was unrelated to any particular political viewpoint, finding that it was perfectly appropriate for a school to disassociate itself from speech or conduct that is inconsistent with the "fundamental values of public school education." 478 U.S. at 685–86, 106 S.Ct. at 3165.

The Court again considered school regulation of speech in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), in which a high school principal had deleted articles about pregnancy and divorce from the school newspaper. It was the practice at that school for students to write articles which the journalism teacher edited. The teacher then submitted the proposed articles to the principal for his review.

The district court held that a public school may restrain speech and activities that are an integral part of the school's educational function if the reason for doing so has a substantial and reasonable basis. The Eighth Circuit reversed, holding that a school newspaper was part of school adopted curriculum intended to be and operated as a conduit for student viewpoints. It was therefore a public forum which precluded censorship unless there was a material and substantial interference with school discipline or the rights of others.

The Supreme Court adopted the Eighth Circuit's forum analysis, determining that if a school paper by policy or practice has been opened for indiscriminate use by the

general public or by some segment of the general public, then it is a public forum. Otherwise, it is not, and the school may impose reasonable restrictions on the speech. 108 S.Ct. at 568. The Court held that, when the First Amendment question presented is whether a school must put its mark or imprimatur on particular speech, *Tinker* does not strictly apply and the school is entitled to greater control over student expression. The school is entitled to disassociate itself from the speech and to control the content of the speech so long as the actions are reasonably related to legitimate pedagogical concerns. *Id.* 108 S.Ct. at 570–71. The Court found that, in the case of the school newspaper, the actions of the school were reasonable.

In the case before the Court, the facts do not fall neatly into any of the three situations presented in the cases discussed above. This is not a situation in which a school has attempted to suppress a particular viewpoint as in *Tinker*. It is also not a case like *Kuhlmeier* in which the student speaker is asking the school to approve or adopt particular speech. Unlike *Fraser*, this case presents no question of a school's disapproval of the content of the speech. In addition, the existing regulation does not absolutely prohibit speech; rather it regulates the time, place and manner of the speech.

Thus, while each is instructive, none of the three cases discussed above is dispositive. Instead, given the general rule that students' constitutional rights exist but are not co-extensive with the same rights in other settings, First Amendment law in other contexts must be analyzed and applied to the facts in this case, heeding *Tinker*'s admonition to consider the special characteristics inherent in the school environment.

■ The Supreme Court has defined the standards for regulation of expression in public and non-public forums. In public forums, government regulation of communication is extremely limited. No content based exclusion is enforceable in a public forum unless the government demonstrates that the regulation is necessary to serve a

compelling state interest and is narrowly drawn to achieve that end. *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980). Time, place and manner restrictions may be enforced so long as they are content neutral, are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55. Public forums are those places which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939), quoted in *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

■ A limited open forum is created when the government opens public property to public use even though the government was not required to create the forum in the first place. When such a forum is created, the government's regulation of speech in that forum is governed by standards similar to those applicable to public forums: reasonable time, place and manner restrictions are permissible if content neutral, while content based prohibitions must be narrowly drawn to achieve a compelling state purpose. *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955.

■ A non-public forum is public property not traditionally considered a public forum and not opened for general use by the public. *Id.* at 46, 103 S.Ct. at 955–6. Government regulation of speech in a non-public forum is governed by standards different from those in the first two categories. In *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686–87, 69 L.Ed.2d 517 (1981), the Supreme Court held that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." In a non-public forum the government can promulgate time, place and manner restrictions as well as restrictions preserving the property for the use to which the forum was lawfully dedicated, so

long as the regulation is reasonable and content neutral. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56.

In *Perry*, a public school had limited the material which could be placed into the inter-school mail system. The United States Supreme Court found that a public school is a non-public forum and therefore that school regulations limiting access were constitutionally permissible. *Id.* at 47, 103 S.Ct. at 956. Likewise in *Kuhlmeier*, the Supreme Court held that a school newspaper is not a public forum unless the school has opened it for indiscriminate use by the general public or by some segment of the general public. 108 S.Ct. at 568.

Forum analysis is not dependent upon merely identifying the property at issue. Rather, the definition of the the forum depends in part upon the access sought by the speaker. In cases in which limited access is sought, Supreme Court cases have taken "a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).

The nature of the forum is not only important in determining the appropriate standard to be applied in analyzing regulations on speech; it also enters into the analysis of whether the regulations are reasonable. In discussing the meaning of reasonable, the Supreme Court in *Cornelius* found that reasonable does not mean "the most reasonable" or "the only reasonable" limitations. 473 U.S. at 808, 105 S.Ct. at 3452. The nature of the place, the pattern of its normal activity, and similar factors define the reasonableness of regulations of time, place and manner. *Id.* at 809, 105 S.Ct. at 3452. "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).

In *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), a regulation required that everyone selling, exhibiting or distributing materials at the state fair do so only from fixed locations on the fair grounds from booths rented from the public corporation operating the fair. The rule, applicable to all non-profit charitable and commercial enterprises, was challenged by the International Society as an unconstitutional suppression of its rights to practice religious rituals requiring church members to distribute or sell religious literature and to solicit donations for the Krishna religion.

The Court noted three things about the regulation. First, the rule applied to all persons and organizations on the same basis. *Id.* at 649, 101 S.Ct. at 2564–65. Second, the purpose of the rule was to maintain order on a crowded fairground. *Id.* at 649–50, 101 S.Ct. at 2565. Finally, the regulation did not exclude the International Society from the fairground or prohibit the members from mingling with the crowd or discussing their views. *Id.* at 655, 101 S.Ct. at 2567–68. For these three reasons, the Supreme Court found that the rule involved a reasonable time, place and manner regulation narrowly drawn to serve the legitimate end of the state's substantial interest. *Id.* at 654, 101 S.Ct. at 2567.

◼ Plaintiffs have advanced the proposition that *Perry's* forum analysis does not control a case such as this one. This proposition distinguishes cases in which the plaintiffs have been denied *access* to the forum from cases in which plaintiffs have access but have been denied *use* of the forum. For example, in *Perry*, the rival labor group never had access to the inter-school mailboxes and was seeking to get access. On the contrary, in *Tinker* the plaintiffs had access but were denied use of the school to propound their views.

From Plaintiffs' perspective, it is logical to examine the type of forum when the issue is whether to deny someone access to it. However, Plaintiffs contend that, where use of the forum is denied, it is illogical and unnecessary to consider the type of forum; instead the Court should begin with the assumption that plaintiffs

who are denied use of a forum to which they already have access are being treated differently than those allowed use. This different treatment is inexplicable, according to Plaintiffs, unless it is based on the content of the speech.

The Court finds three major flaws in Plaintiffs' argument. First, the Court rejects the argument that forum analysis is improper; *Tinker* is not a blanket rejection of forum analysis and is in fact entirely consistent with that approach. The high standard required by the *Tinker* Court is precisely the standard required under forum analysis for content based restrictions in limited public forums. Because the Court there found that a generalized fear of disruption was not a sufficiently significant government interest, the regulation was unconstitutional.

Second, assuming arguendo that forum analysis is not the proper way to approach the First Amendment questions raised here and assuming arguendo that the Court were to presume that some content based distinction lay at the root of Moline's rule, given the facts established by the record in this case, the "content" which triggered the differential treatment is whether the material was school related or not. This distinction was clearly approved by the Supreme Court in *Kuhlmeier;* differential treatment by a school of core/curriculum speech than of non-school speech is appropriate. Only if a rule were to treat differently different types of non-school speech might this Court say that the differential treatment was truly content based in a way which would trigger the high standard of review. Thus, the fact that Moline High School's rule applies only to non-school speech does not without more make the rule unconstitutional.

Finally, unlike the students in *Tinker,* these Plaintiffs have not been denied use of the school; rather, the time, place and manner of the use has been limited. A consideration of the nature of the forum in determining the reasonableness of such restrictions is entirely proper; as the Court stated in *Cornelius,* a consideration of the type of place and the normal activities of the place must define the limits of reasonable limitations. The fact that schools in general have a limited purpose and a special audience make regulations of time, place and manner such as the one at issue here entirely reasonable.

In summary, the Court rejects Plaintiffs' argument that *Tinker* is to be mechanically applied in all cases involving non-school speech. Rather, the forum analysis set forth in *Perry* is the proper approach in evaluating restrictions placed on non-school speech. Only where the restriction is truly content based must *Tinker's* high standard be imposed.

■ Plaintiffs also argue in the alternative that Moline High School's rule is content based and that the hallways of a public school are public forums. This Court rejects both arguments. First, the regulation treats all non-school speech evenhandedly; there is no evidence that *Issues and Answers* has been treated any differently than other non-school publications. The fact that school speech is regulated in a different manner does not make the rule content based.

Second, Plaintiffs have utterly failed to demonstrate that the hallways are public forums. In *Kuhlmeier, Perry,* and *Cornelius,* the Supreme Court stated that public schools do not normally possess attributes of traditional public forums (like streets and parks). Nothing has been brought to the Court's attention which might indicate that this school has been traditionally considered to be held in trust for the use of the public for discussion of public questions. In fact, the opposite conclusion appears to be closer to the truth. The High School has never been held in trust for open communication among the general populace.

For similar reasons, the hallways are not limited public forums; nothing in the record supports a finding that the high school's halls have been opened for public use. The principal lists in his affidavit quite a number of non-school organizations which sought access to the students. All were limited to placing their materials in the office for student pick-up prior to en-

actment of the new policy, and nothing in the record indicates that these groups are not similarly limited by the new regulation. The hallways of Moline High School are not limited public forums either.

Rather, the hallways of a public school during the school day are non-public forums. The school's interests in protecting the students and in making the environment conducive to an education support such a finding; preserving the school for the use to which it has been lawfully dedicated (i.e., teaching "fundamental values of public school education") is thus entirely proper.

■ Even if this Court were to have found the hallways to be limited public forums, the existing regulation is an entirely reasonable restriction on the time, place and manner of communicating non-school speech. The regulation applies evenhandedly to all non-school speech. The purpose of the regulation is also a reasonable concern with safe and orderly passage by students in the hall, as well as an aesthetic (and economic) concern with littering. The rule does not preclude non-school organizations from reaching the students; it merely limits the times during which and places at which the students can be reached.

Plaintiffs' argument that the regulation amounts to a prior restraint is simply not based in law. They cite no case law to the effect that a reasonable and otherwise constitutional time, place, or manner restriction on distribution of printed material can ever rise to the level of prior restraint. The Court is certain that, in fact, case law holds precisely the opposite. The Plaintiffs have utterly failed to show that the rule falls within the legal definition of "prior restraint."

Plaintiffs also argue that the existing policy is vague and overbroad. The overbreadth argument is largely dependent upon strict application of *Tinker:* the school's failure to identify the disruption that the regulation alleviates results in regulation insufficiently tailored to achieve that goal. There is no more merit to this argument here than in the previous analysis. Such a disruption is not a necessary prerequisite to a regulation such as the one at issue here.

Furthermore, under First Amendment overbreadth doctrine, a rule may be invalidated only if there is a "realistic danger that the [rule] itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Airport Comm'rs of Los Angeles v. Jews for Jesus,* 482 U.S. 569, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987), quoting *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 2126–27, 80 L.Ed.2d 772 (1984). Plaintiffs in this case have completely failed to make such a showing, and the Court deems it unlikely that such a showing could be made. *See, e.g., Fraser,* 478 U.S. 675, 106 S.Ct. 3159.

Likewise, this rule does not suffer from problems of vagueness. The rule allows for no discretion on the part of the school administration (except for prohibitions on lewd or obscene speech and otherwise apparently objectively defined speech, which types of speech are not at issue in this case); the school must approve the materials within two hours. The regulation leaves no room for *post hoc* rationalizations or shifting, illegitimate criteria and is thus not vague in the constitutional sense.

The Court notes that a surprising amount of the case law upon which Plaintiffs have relied is completely inapposite. Certain propositions, standards and findings put forth in those cases dealt with regulations very different from the one in place at Moline High School. Such superficial use of precedent is inappropriate in legal argument.

Accordingly, to the extent that Plaintiffs seek a judgment that the existing policy at Moline High School violates students' First Amendment rights and damages for that violation, the Defendants' Motion for Summary Judgment is GRANTED and the Plaintiffs' Motion for Summary Judgment is DENIED. The balance of the Motions, dealing with the policies superseded by the one discussed herein, is RESERVED. This order shall not constitute a final judgment

until the issues regarding the previous policies have been resolved.

## ON RESERVED ISSUES

As discussed in this Court's Order of September 19, 1989, this case involves challenges to Moline High School's regulation on the distribution of non-school literature on school grounds. Three different regulations are involved in the lawsuit as a whole. In its Order of September 19, 1989, this Court determined that the written regulation which is in effect now and has been in effect since November 24, 1987 withstands constitutional challenge. This Order deals with the validity of the other two regulations. Pending before the Court are Cross–Motions for Summary Judgment regarding those two regulations.

Initially there is some dispute between the parties as to what the substance of the regulation was at the time these Plaintiffs were first affected by it. On the one hand, Assistant Principal Mary Foster, who was acting principal on October 19, 1987, told the students that it was her understanding that distribution of political or religious literature on school grounds was prohibited. The record shows that she conveyed this information to the Plaintiffs and subsequently to the Principal of the school, Keith Schwab.

On the other hand, however, Mr. Schwab asserts in his affidavit that the practice at the school was to limit distribution of materials to making them available from the school office. In other words, Schwab claims that the policy prior to November 19, 1987 was in fact the same as the policy which was announced to the student body on November 19, 1987 and in effect until the written policy was implemented on November 24.

This Court has considered all the evidence in the record and finds that, despite Schwab's assertions, the *de facto* policy was as expressed by Assistant Principal Foster. First, the record contains nothing which contradicts the Plaintiffs' version of what they were told by Foster. Indeed, Foster's own deposition supports the Plaintiffs' claim that they were told no distribu-

tion of religious or political materials would be allowed in the school. Second, according to Foster's deposition, she informed Schwab of her conversation with the students very shortly after that conversation took place. Schwab took no action to correct either Foster's or the Plaintiffs' "misunderstanding" of what the school's policy was until November 19 when he announced the new rule. Rather, he allowed the Plaintiffs to continue to operate under the assumption that the school's practice was as Mary Foster had informed them.

Thus, the ultimate questions before this Court are (1) whether a regulation which prohibits distribution of all political and religious materials on school grounds can pass constitutional muster; and (2) whether a regulation which limits "distribution" to a particular location and which requires prior approval of the content of the printed material, without providing any guideline for that approval is constitutional.

The Court's initial concern (expressed at the hearing on July 25) was whether these Plaintiffs had standing to challenge that rule. The record as it existed at the time of the hearing indicated without contradiction that these Plaintiffs had never been punished for distributing *Issues and Answers* in contradiction to the rule. The record was vague at best as to whether these Plaintiffs had been chilled in exercise of any First Amendment right which existed. In fact, the record seemed to indicate that the Plaintiffs had distributed all the literature which they had, and that they had made no further attempts to obtain more literature or to pass it out until their meeting on November 19 with Schwab. By that time, the school's regulation had been changed.

In response to the Court's concerns, Plaintiffs submitted a supplemental memo and an additional affidavit of Plaintiff David Nelson. The Defendants have moved to strike David Nelson's affidavit.

In his affidavit, David Nelson claims that between October 19 and November 18, 1987, he "could have continued distributing additional copies of *Issues and Answers,*

but chose not to because of the incident with Miss Foster."

Even if the Court considers his affidavit (an issue it is not here deciding), there appears to have been no chilling effect on these Plaintiffs. The language quoted above very carefully refrains from saying that these Plaintiffs "would have" attempted to distribute further copies of the magazine. Other than this affidavit, there is nothing in the record which indicates that these Plaintiffs wanted or intended to distribute further copies. Indeed, the record seems to indicate just the opposite. In Nelson's deposition, for example, he stated that he made no attempts to distribute any more copies between the initial discussion with Miss Foster and the discussion with Mr. Schwab on November 19 "because they only come out once a month."

Since the Court finds that consideration of the affidavit makes no difference in its determination of whether these particular Plaintiffs were chilled, there is no need to rule on the Defendants' Motion to Strike the Affidavit. Rather, the Court finds that the regulation produced no chilling effect on these particular Plaintiffs.

■ In certain instances, however, the lack of a direct injury or a chilling effect on the Plaintiffs before the Court is not required for standing to pursue a First Amendment challenge. In *Schultz v. Frisby*, 807 F.2d 1339 (7th Cir.1986), the court considered the exceptions to the general rule that constitutional adjudication requires "a review of the application of a statute to the conduct of the party before the court." *Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984). In *Taxpayers for Vincent*, the Supreme Court stated that:

> In order to decide whether the overbreadth exception is applicable in a particular case, we have weighed the likelihood that the statute's very existence will inhibit free expression ... where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but

substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 799–800, 104 S.Ct. at 2126. The Court went on to hold that there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protection of parties not before the court in order for the plaintiffs before the court to challenge the regulation facially on overbreadth grounds. *Id.* at 801, 104 S.Ct. at 2126-7. After so stating, the Court determined that the ordinance challenged before it was not an appropriate case for an overbreadth challenge because the record failed to indicate that the ordinance would have any "different impact on any third party's interest in free speech than it has on [parties before the court]." *Id.*

The record in the case presently before the Court strongly suggests that other persons not presently before the Court would have been impacted differently than were these Plaintiffs (who made no attempt to exercise their First Amendment rights and who have demonstrated no desire to have done so). It is entirely plausible that others would have desired to distribute literature on school grounds and would have faced a dilemma; whether to risk punishment or to refrain from distribution.

Although the Plaintiffs here did not face that dilemma, the likelihood that others would is sufficient, under *Vincent* and *Schultz*, to confer standing on these Plaintiffs. If the regulation was indeed what Mary Foster said it was, it is clear that every person seeking access to the students at the high school would "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Hirschkop v. Snead*, 594 F.2d 356, 371 (4th Cir.1979), quoting *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). *See, Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).

Additionally, there is a second aspect to the overbreadth doctrine. In some cases, courts have invalidated statutes on their face without inquiring into any particular applications to specific facts. In those

cases, the courts found that an ordinance or a rule was constitutionally invalid on its face because it is unconstitutional in every conceivable application, thus recognizing standing without any consideration of the injury to or chilling effect on the parties before them. However, the Supreme Court has also recognized that even if a statute or regulation is demonstrably overbroad and may thus deter legitimate exercise of First Amendment rights, a court must proceed with caution and restraint in order to avoid undue interference with the state regulatory program. In accommodating these competing interests, the Supreme Court has held "that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, ... and its deterrent effect on legitimate expression is both real and substantial."

 The regulation or practice in effect at the time of the initial incident with these Plaintiffs appears incapable of being limited by construction. First and foremost, it is a content-based regulation treating religious and political speech differently and more restrictively than other form of non-school speech. Second, the regulation was unwritten, which means that it was capable of illegitimate post hoc rationalization. Finally, by its plain terms, the regulation was not susceptible of a narrowing construction; it absolutely prohibited certain broad categories of speech.

Even if the practice at the school had been as Principal Schwab claims it was, similar criticisms can be offered. The regulation announced on November 19, which is identical to the regulation Principal Schwab claims existed prior to that date, contains no guidelines for the principal and allows the school administration absolute discretion in granting or withholding approval of distribution of the publications. Where a regulation is not limited by some reasonably precise standard for ascertaining acceptability, it is unconstitutionally vague.

As suggested in the above discussion regarding standing, this Court has no doubt that both policies were unconstitu-

tional on their face. A content-based regulation linked to no compelling need and enforceable at the unbridled discretion of administrators cannot stand. Likewise, a policy which requires prior approval of the printed material but which provides no objective guidelines within which approval is to be given or withheld must fall.

Accordingly, the Court finds that the school's policy prior to November 19, 1987 as well as the policy in effect from November 19-24 were unconstitutional. The Plaintiffs conceded that their damage claims flowing from the November 19 rule as announced by Principal Schwab depend upon a previous finding by this Court that the November 24 written regulation was unconstitutional. Despite this concession, the Court finds a real and substantial distinction between the invalid rule in effect from November 19 through November 24, and the valid rule implemented on November 24. In other words, both the *de facto* policy and the oral policy were unconstitutional.

The Court notes that Plaintiff Matthew Rogerson has limited his claims to the oral policy and the written policy; he states that he did not seek to distribute *Issues and Answers* until after November 19. Accordingly, the judgment entered by this Court regarding the first policy does not apply to Mr. Rogerson.

Thus, the Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment as to the *de facto* regulation in effect prior to November 19, 1987. The Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment as it relates to the oral policy announced on November 19, 1987. Because these Plaintiffs have demonstrated no particularized injury directly resulting from the constitutional violation, they are entitled only to nominal damages. Entry of injunctive relief would be inappropriate since the regulation is no longer in effect and there is no indication that the school has any intention of reverting to that rule.

978

Plaintiffs also seek attorneys' fees. They are directed to file a petition, setting forth the amount sought, with whatever documentation is necessary to support their claim. Such petition is to be filed within 21 days of the date of this order. Response by Defendant is due 14 days thereafter.

This order shall not be deemed a final order for purposes of appeal until the issue of attorneys' fees is resolved.