*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0362p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

M.A.L., a minor child, by and through his parents
and next friends, M.L. and S.A.,
                              *Plaintiff-Appellee,*

                    *v.*

STEPHEN KINSLAND,
                              *Defendant-Appellant.*

> No. 07-1409

—————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-10391—Victoria A. Roberts, District Judge.

Argued: March 13, 2008

Decided and Filed: October 7, 2008

Before: KEITH, DAUGHTREY, and ROGERS, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** Roy H. Henley, THRUN LAW FIRM, East Lansing, Michigan, for Appellant. Byron J. Babione, ALLIANCE DEFENSE FUND, Scottsdale, Arizona, for Appellee. **ON BRIEF:** Roy H. Henley, Kirk C. Herald, Martha J. Marcero, THRUN LAW FIRM, East Lansing, Michigan, for Appellant. Byron J. Babione, Benjamin W. Bull, Delia B. van Loenen, ALLIANCE DEFENSE FUND, Scottsdale, Arizona, Steven M. Jentzen, STEVEN M. JENTZEN, P.C., Ypsilanti, Michigan, for Appellee. Steven W. Fitschen, NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, Francisco M. Negron, Jr., NATIONAL SCHOOL BOARD ASSOCIATION, Alexandria, Virginia, for Amici Curiae.

—————————

## OPINION

—————————

ROGERS, Circuit Judge. This case presents the question of whether it is constitutional for a public middle school to regulate the time, place, and manner of a student's speech by preventing him from handing out leaflets in school hallways between classes and instead allowing him to post his leaflets on hallway bulletin boards and to distribute them during lunch hours from a cafeteria table. The district court held that such a regulation of student speech is unconstitutional absent a showing that the speech is likely to cause a material and substantial interference with the

1

requirements of appropriate discipline in the operation of the school, citing the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). The district court permanently enjoined enforcement of Jefferson Middle School's distribution policy and its prohibition on the student's hallway distribution. The court also awarded the student one dollar in nominal damages. For the reasons that follow, we reverse the district court's entry of a permanent injunction and its award of nominal damages.

I.

Michael, a 14-year-old, eighth-grade student,[1] participated in the nationwide "3rd Annual Pro-Life Day of Silent Solidarity" organized by the national group "Stand True." On the designated day, middle and high school students across the country express their views against abortion by wearing red armbands, distributing literature detailing various facts about abortion, and remaining silent throughout the school day with red tape over their mouths to symbolize that they speak for unborn children. Michael arrived at school on October 24, 2006, with red duct tape over his mouth and wrists, wearing a sweatshirt that said "Pray to End Abortion." Before school started, Michael also distributed leaflets containing abortion statistics to those who approached him.

During Michael's first-hour class, his teacher, Gary Boudrie, sent him to the principal's office, stating that Michael's sweatshirt and tape were causing a disruption. Because the principal was not yet in that morning, Michael was sent to Andrea Werner, a guidance counselor. After speaking with the School District's Superintendent, Timothy Fitzpatrick, Mrs. Werner told Michael that he must remove the duct tape and either turn his sweatshirt inside-out, take it off, or wear a different shirt. According to Michael, Mrs. Werner explained to him that his message was "political" and that the school "could speak about abstinence, but not about abortion, and that the school had to remain neutral and people couldn't take sides." Neither Mrs. Werner nor Mr. Boudrie discussed Michael's leaflets, and Michael eventually returned to class.

Michael claims that later that day, in the cafeteria, he wished to use the front pocket of his sweatshirt to carry his school binder so that he could use his hands to carry his saxophone to band class. Michael turned his sweatshirt right-side-out and began covering its "Pray to End Abortion" message with a piece of paper and tape. Mrs. Werner saw Michael switching his sweatshirt right-side-out and sent him to the principal's office, where Principal Stephen Kinsland reiterated to Michael the previously issued sweatshirt directives.

While in Principal Kinsland's office Michael raised the issue of leaflet distribution. Principal Kinsland informed Michael that his leaflets had to be pre-approved before he could distribute them and that, because Michael's leaflets had not been approved, he could not distribute them that day. Kinsland testified that students typically ask his permission before posting or distributing literature, and that Michael had asked Kinsland earlier that year for permission to post flyers about forming a student Christian club and was granted permission. Michael testified, however, that although he had asked for permission to post materials in the past, he did not think he needed permission to distribute leaflets. No disciplinary action was taken against Michael on October 24, and Principal Kinsland spent part of the afternoon picking up leaflets from hallway floors and removing those that had been taped to drywall and appliances.

---

[1]Michael attends Jefferson Middle School, which has 7th and 8th grade classes, but also has a preschool and pre-primary impaired classrooms. Children begin attending the preschool and pre-primary impaired programs at approximately age 3, and mix with the older children in the halls.

On January 24, 2007, Michael and his parents filed the instant lawsuit,[2] expressing an "urgent need" for injunctive and declaratory relief so that Michael could engage in a similar protest on January 31, 2007. Michael also sought damages "to vindicate his constitutional rights which were violated by Defendants." On January 29, 2007, the parties made the following stipulations regarding the January 31 protest:

> 1. Plaintiff cannot wear tape on his mouth.
>
> 2. Plaintiff may wear red tape on his wrists.
>
> 3. Plaintiff may wear a black hooded sweatshirt which says on the front, "Pray to End Abortion."
>
> 4. Jefferson School District retains the right to control the conduct if there are material and substantial disruptions or the reasonable forecast of such disruptions.
>
> 5. Plaintiff may engage in 1-3 until final judgment is entered by the Court.
>
> 6. For purposes of the equitable relief sought, Defendants are not taking the position that the literature Plaintiff seeks to distribute would cause a substantial disruption or a material interference with the normal operation of the school or school activities.

The parties did not reach agreement, however, on whether Michael would be allowed to distribute his leaflets in the school hallways.

> In pertinent part, the school's distribution policy provides that
>
> Students will have the right to distribute and possess in or on school premises, school buses, or at school sponsored activities any form of literature, including but not limited to newspapers, magazines, leaflets, and pamphlets. Students shall be responsible for the content of such materials. This right is, however, subject to limitation in accordance with standards of responsible journalism and in consideration of the rights and welfare of the entire student community.
>
> In order to ensure that the welfare and rights of the community are adequately protected, the following will apply in the case of any distribution of literature on school premises or at times students are under the jurisdiction of the school:
>
> 1. Any literature which a student wishes to distribute or possesses to distribute will first be submitted to the principal, or his/her designee, for approval. The principal may have up to three days to review the material before approving or disapproving. If disapproved, the principal shall state the reasons in writing.
>
> . . .
>
> 3. The principal may deny approval to the distribution of any literature the content or distribution of which he/she reasonably determines:

---

[2]Named as defendants were Stephen Kinsland, individually and in his official capacity as Principal of Jefferson Middle School; Timothy Fitzpatrick, in his official capacity as Superintendent of Jefferson School District; Andrea Werner, individually and in her official capacity as a Guidance Counselor at Jefferson Middle School; Gary Boudrie, individually and in his official capacity as a teacher at Jefferson Middle School; and the Jefferson School District.

   a. Would cause a substantial disruption of or a material interference with the normal operation of the school or school activities.

   b. Is potentially offensive to a substantial portion of the school community due to the depiction or description of sexual conduct, violence, morbidity or the use of language which is profane or obscene which is inappropriate for the school environment as judged by the standards of the school community.

   c. Is libelous or which violates the rights of privacy of any person.

   d. Is false or misleading or misrepresents facts.

   e. Is demeaning to any race, religion, sex, or ethnic group.

   f. Encourages violation of local, state or federal laws.

. . .

6. In the event the submitted publication is denied the privilege of distribution, the applicant may:

   a. Appeal the decision of the principal within five (5) school days to the superintendent, who shall reply within five (5) school days.

   b. Further appeal may be made to the Board of Education within five (5) school days. The Board shall provide a hearing within ten (10) days with the decision made at its next regular meeting.

7. Distribution is defined as giving out or division among a number of persons, sharing or parceling out, allotting, dispensing, apportioning, either by physically doing so or placing the material to be distributed in any public area so that another person may obtain the same either for a free [sic] or without charge.

8. If the principal gives his/her approval, he/she may designate a time and/or a place at which the distribution may take place. The distribution shall be orderly and the designated area for distribution shall be kept free of loosely scattered material.

Although the policy is not formally distributed to students, Principal Kinsland testified that he reads any amendments to the policy to the students at an assembly at the beginning of each school year.

Neither Michael nor his parents provided Michael's proposed leaflets to the school before filing suit on January 24, and Michael did not formally seek permission to distribute them on the 31st. The school nevertheless offered to allow Michael to post his leaflets on bulletin boards in the hallways and to distribute them in the cafeteria during lunch, reasoning that the school is entitled to place reasonable time, place, and manner restrictions on the distribution of literature. Michael was dissatisfied with the school's offer, however, and argued pursuant to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), that the school may only regulate the time, place, and manner of his speech if his leaflet distribution is likely to cause a material and substantial disruption. The parties agreed that Michael's leaflet distribution was not likely to cause a disruption, and Michael accordingly argued that he has a constitutional right to distribute his leaflets in the school hallways.

The district court rejected the school district's arguments and entered a preliminary injunction on January 31 prohibiting the school from restricting Michael's leafleting in the hallways.

The court concluded that, because the school had not demonstrated that the leafleting had caused or would cause a material and substantial disruption under *Tinker*, restricting Michael's distribution to hallway bulletin boards and the cafeteria violated Michael's First Amendment rights. The court also concluded that the school's distribution policy was unconstitutionally overbroad because it applies to "any distribution of literature on school premises," which the court reasoned could potentially prohibit students from distributing car or music magazines to their friends without prior approval.

The district court converted its preliminary injunction into a permanent injunction on March 19, 2007, permanently enjoining the school's enforcement of its distribution policy and specifically stating that the school could not restrict Michael's literature distribution absent a showing that his distribution would "materially and substantially interfere with the requirements of appropriate discipline in the operation of Jefferson Middle School, or intrude upon the rights of other students." The court also awarded Michael nominal damages of one dollar.

On appeal, the school district argues that it is entitled to place reasonable time, place, and manner restrictions on students' distribution of literature and that the district court erred in applying the heightened *Tinker* standard—applicable to content and viewpoint specific regulations—to its distribution policy. The school additionally argues that the district court's award of damages was inappropriate and that the individual defendants are entitled to qualified immunity.

II.

While it is true that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker*, 393 U.S. at 506, "[i]t is also common ground . . . that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). The extent to which the government may regulate speech in a particular forum depends upon the nature of the forum. *Id.*

Repeated statements by the Supreme Court and multiple circuits, including this one, make it clear that school areas such as hallways constitute nonpublic forums. As the Supreme Court explained in a case involving a school newspaper:

> The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hence, school facilities may be deemed to be public forums only if school authorities have "by policy or by practice" opened those facilities "for indiscriminate use by the general public," or by some segment of the public, such as student organizations. If the facilities have instead been reserved for other intended purposes, "communicative or otherwise," then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (internal citations omitted). Our circuit has held that the grounds of a public school were "neither a traditional public forum nor a

government-designated one," despite Ohio's use of the school for polling purposes on election day. *United Food & Commercial Workers Local 1099*, 364 F.3d 738, 749 (6th Cir. 2004). In the case involving the distribution of materials, the Seventh Circuit has held that a public elementary school is not a public forum. *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1539-40 (7th Cir. 1996). *See also Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1300 (7th Cir. 1993) (concluding that junior high school is a nonpublic forum); *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 277-78 (4th Cir. 1998) (accepting district court's conclusion that school is a nonpublic forum); *LoPresti v. Galloway Twp. Middle Sch.*, 885 A.2d 962, 967 (N.J. Super. Ct. Law Div. 2004) (holding school a nonpublic forum).

Jefferson school authorities have done nothing to indicate that the Jefferson Middle School hallways have been opened for indiscriminate use by the public, and the hallways therefore constitute a nonpublic forum. The school district accordingly is entitled to put time, place, and manner restrictions on hallway speech so long as the restrictions are viewpoint neutral and reasonable in light of the school's interest in the effectiveness of the forum's intended purpose. *United States v. Kokinda*, 497 U.S. 720, 730 (1990); *Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 845 (6th Cir. 2000).

The school in this case offered to allow Michael to post his leaflets on bulletin boards in the hallways and to distribute them in the cafeteria during lunch, despite the fact that Michael has never sought permission to distribute his leaflets in accordance with the school's distribution policy. This minor regulation of Michael's speech is eminently reasonable. "Prohibiting handbilling in the hallway between classes is . . . reasonable to avoid congestion, confusion, and tardiness, to say nothing of the inevitable clutter caused when the recipient indiscriminately discards the handout," *Muller*, 98 F.3d at 1543, and there is no indication that Jefferson's proposed time, place, and manner regulation of Michael's speech is based on a desire to suppress Michael's anti-abortion viewpoint. Indeed, as the school district noted in its brief, the school's regulation allows Michael ample opportunity to express his viewpoint to his fellow schoolmates:

> Interested individuals will be able to obtain copies of the literature he wishes to distribute, either from appropriate bulletin board or hallway postings, or from a cafeteria table. By those means, the entire middle school population will have access to this information during virtually all non-instructional time.

It is also reasonable for the school to require prior approval before permitting students to distribute literature. "There is nothing unconstitutional per se in a requirement that students submit materials to the school administration prior to distribution," *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 969 (5th Cir. 1972), and the particular distribution policy at issue in this case is well within constitutional boundaries. Jefferson's distribution policy is viewpoint and content neutral,[3] and it provides clear standards against which the principal must exercise his discretion to approve or disapprove of a proposed distribution. Indeed, without such standards, the policy would be more open to attack as subject to arbitrary enforcement. *Cf. Heffron*, 452 U.S. at 649 (noting, in the context of public forums, the constitutional problems inherent in policies providing broad, standardless discretion to implementing officials); *Ater v. Armstrong*, 961 F.2d 1224, 1227-28 (6th Cir. 1992) (rejecting argument that statute forbidding literature on public roadways vested officials

---

[3]Although the policy refers to the "content" of the literature in detailing the circumstances under which the principal may deny approval for distribution, the policy is "content neutral" in the constitutional sense. It does not, for example, limit distribution approval to literature about race cars, but rather carves out specific categories of speech that the Supreme Court has held may be constitutionally proscribed, such as speech that would cause a substantial disruption of or material interference with the normal operation of the school (*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)); sexually explicit, violent, profane, or obscene speech (*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)); and speech that encourages violation of the law (*Morse v. Frederick*, 127 S. Ct. 2618 (2007)).

with arbitrary discretion); *Putnam Pit*, 221 F.3d at 845-46*; Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006) (noting broad agreement that "even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment").

Moreover, Jefferson's distribution policy is not overbroad. Although Michael and his parents argue that, because the policy requires prior approval for the distribution of "any literature," it could potentially require students to seek approval before passing a note or handing a magazine to a friend, a common-sense reading of the policy reveals that this concern is unfounded. Prior approval is only required for "distribution," which action the policy clearly defines as

> giving out or division among *a number of persons*, sharing or parceling out, allotting, dispensing, apportioning, either by physically doing so or placing the material to be distributed in any public area so that another person may obtain the same either for a [fee] or without charge.

(Emphasis added.) Thus, while Michael must receive approval before he is allowed to hand out his leaflets to multiple students, he would not be required to seek permission before passing a car magazine to a friend at lunch. The plaintiff also misconstrues the policy when he asserts that it allows Jefferson to deny distribution approval if it merely determines material to be "inappropriate." While the word "inappropriate" does appear in the policy, it appears in the context of a much more specific paragraph that allows the principal to deny distribution approval to a narrow category of unprotected speech and speech that schools have authority to prohibit under the Supreme Court's decision in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986):

> The principal may deny approval to the distribution of any literature the content or distribution of which he/she reasonably determines . . . [i]s potentially offensive to a substantial portion fo the school community due to the depiction or description of sexual conduct, violence, morbidity or the use of language which is profane or obscene which is inappropriate for the school environment as judged by the standards of the school community.

Distribution Policy, J.A. 57.

Contrary to Michael's arguments, this case is not governed by the heightened "material and substantial interference" standard articulated by the Supreme Court in *Tinker*. In that case, a group of adults and students in Des Moines held a meeting and agreed to publicize their objections to the Vietnam War by wearing black armbands. 393 U.S. at 504. Des Moines school authorities caught wind of this plan and, in response, adopted a policy that any student wearing an armband to school would be asked to remove it and suspended if he refused. *Id.* John Tinker, a 15-year-old public high school student, wore a black armband to school in accordance with the protest and was promptly sent home and suspended. *Id.* The Supreme Court held that, in the absence of any evidence that Tinker's expression of opinion was likely to cause a material and substantial interference with the requirements of appropriate discipline in the operation of the school, the school's suppression of Tinker's speech violated Tinker's First Amendment rights. *Id.* at 511-14.

The key difference between *Tinker* and the instant case is that the school officials in *Tinker* sought to silence the student because of the particular viewpoint he expressed, while the Jefferson school authorities have merely sought to regulate the time, place, and manner of Michael's speech irrespective of its content or his viewpoint. This distinction is evident from the *Tinker* opinion:

> In order for the State in the person of school officials to justify prohibition of *a particular expression of opinion*, it must be able to show that its action was

caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany *an unpopular viewpoint*. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.

. . .

. . . [T]he action of the school authorities appears to have been based upon an urgent wish to avoid the controversy which might result from the expression, even by the silent symbol of armbands, of opposition to this Nation's part in the conflagration in Vietnam. It is revealing, in this respect, that the meeting at which the school principals decided to issue the contested regulation was called in response to a student's statement to the journalism teacher in one of the schools that he wanted to write an article on Vietnam and have it published in the school paper. (The student was dissuaded.)

It is also relevant that the school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance. The record shows that students in some of the schools wore buttons relating to national political campaigns, and some even wore the Iron Cross, traditionally a symbol of Nazism. The order prohibiting the wearing of armbands did not extend to these. Instead, a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam—was singled out for prohibition. Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible.

*Id*. at 509-11 (emphasis added) (footnotes omitted).

Thus schools must meet a higher constitutional standard when they seek to foreclose particular viewpoints than when they seek merely to impose content-neutral and viewpoint-neutral regulations of the time, place, and manner of student speech. While *Tinker* requires schools to demonstrate a "material and substantial interference" with the educational process in order constitutionally to silence a student on the basis of the student's particular viewpoint, Jefferson School District certainly need not satisfy this demanding standard merely to impose a viewpoint-neutral regulation of the manner of Michael's speech to prevent hallway clutter and congestion.[4]

Other circuits have come to the same conclusion. The Fifth Circuit in *Canady v. Bossier Parish School Board*, 240 F.3d 437, 442-43 (5th Cir. 2001), concluded that the Supreme Court's *Tinker/Fraser/Hazelwood* trilogy of cases does not control viewpoint-neutral time, place, and manner restrictions. The Fourth Circuit in *Glover v. Cole*, 762 F.2d 1197, 1202-03 (4th Cir. 1985), rejected *Tinker*'s application to a neutral time, place, and manner regulation prohibiting solicitation on school grounds. *See also Nelson v. Moline Sch. Dist.*, 725 F. Supp. 965, 973 (C.D. Ill. 1989) (rejecting argument that "*Tinker* is to be mechanically applied in all cases involving non-school speech" and explaining that "[o]nly where the restriction is truly content based must *Tinker*'s high

---

[4] In a recent case deciding that the strict *Tinker* standard had been met, we reasoned broadly that school regulation of the content of student speech should be analyzed under *Tinker* unless the speech falls within the *Fraser* or *Hazelwood* categories. *See Barr, et al. v. Lafon, et al.*, No. 07-5743, slip op. at 8 (6th Cir. Aug. 20, 2008). Our phrasing in *Barr* should not be read, however, to require the application of *Tinker* beyond the context of content-specific regulation to content-neutral time, place, and manner restrictions. Such a reading was not necessary to our decision in that case, which involved content-specific regulation. Forum analysis was neither implicated nor addressed in *Barr*.

standard be imposed”); *Lopresti v. Galloway Twp. Middle Sch.*, 885 A.2d 962 (N.J. Super. Ct. Law Div. 2004); *Phoenix Elem. Sch. Dist. No. 1 v. Green*, 943 F.2d 836, 838 (Ariz. 1997); *Isaacs v. Bd. of Educ. of Howard County, Maryland*, 40 F. Supp. 2d 335, 337 (D. Md. 1999); *Guzick v. Drebus*, 305 F. Supp. 472, 479 (N.D. Ohio 1969); *Littlefield v. Forney Ind. Sch. Dist.*, 108 F. Supp. 2d 681, 691 (N.D. Tex. 2000). Indeed, requiring the Jefferson school district to satisfy *Tinker*’s heightened standard in the present circumstances would produce numerous legal anomalies, the most obvious of which is that schools would have less discretion over the use of school facilities than is exercised by any other public entity over any other forum on public property. This is not the law. Time, place, and manner restrictions may be enforced even in a *traditional public forum* so long as they are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *E.g.*, *Perry Educ. Ass’n v. Perry Local Educators’ Ass’n*, 460 U.S. 37, 45 (1983).

Finally, we reverse the district court’s award of one dollar in nominal damages. We read the district court’s order as granting damages based on the unconstitutionality of Jefferson Middle School’s distribution policy. Because the school’s distribution policy did not violate Michael’s rights, no damages may be awarded on that basis.

III.

For the foregoing reasons, we reverse the district court’s entry of a permanent injunction and its award of nominal damages.