Sissy **LITTLEFIELD**, David Littlefield, Joel Odom, Susan Becmer, Nicholas Becmer, Jonathan Becmer, Stan Bland, Glenda Bland, Jennifer Bland, Jeffery Bland, Steve Calvery, Greta Calvery, Ashley Calvery, Scott Ryan Calvery, Lenny McKinney, Opal McKinney, Beverly McKinney, Rebecca McKinney, Virginia McLaren, Natalie Johnson, Tom Napper, Brandi Napper, Kevin Napper, Chelsea Napper, Mary Penn, Haley Penn, Lynzi Anderson, Drew Anderson, Michael Karadimas, Karen Stacey–Karadimas, Sunni Stacey, William Tapley, Norma Tapley, Kaytie Elizabeth Tapley, Cecilia Williams, Rachel Diane Williams, Cindy Woods, Dustin Woods, Benjamin Woods, Chad Woods, Aaron Woods, Danny Duckworth, Belinda Duckworth, Jeremiah Duckworth, Clayton Duckworth, Tammy Winner, Mark Winner, Ryan Winner, Daniel Ingram, Cliff Clipp, Kim Clipp, Michael Lambeth, Cash Cliff Clipp, Joe Don Law, Brad Law, David Lowery, Vanita Lowery, Madeline Lowery, Keith McCullam, Margaret McCullam, and Brandi McCullam, Plaintiffs,

v.

**FORNEY INDEPENDENT SCHOOL DISTRICT**, Keith Bell, Kenneth Cleaver, Clarence Doggan, Jay Calvin, Jim Jacobs, Rick Townsend, David Walker, and Chester J. St. Clair, Defendants.

**No. 3:00–0575–T.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 3, 2000.

Lawrence S Fischman, Glast Phillips & Murray, Dallas, TX, for plaintiffs.

Trey Langston Dolezal, Henslee Fowler Hepworth & Schwartz, Austin, TX, Hermon L Veness, Jr, Andrew A Chance, Henslee Fowler Hepworth & Schwartz, Dallas, TX, for defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT MOTIONS TO DISMISS

MALONEY, District Judge.

Before the Court are two Motions to Dismiss Pursuant to Rule 12(b)(6), filed on May 31, 2000, and Defendants' Motion for Summary Judgment, filed on June 5, 2000, by Defendants Forney Independent School District, Keith Bell, Kenneth Cleaver, Clarence Doggan, Jay Calvin, Jim Jacobs, Rick Townsend, David Walker, and Chester J. St. Clair (collectively, "the School Board"). After consideration, the Court concludes that the motion for summary judgment should be granted and Plaintiffs' complaint should be dismissed. Accordingly, Defendants' outstanding motions to dismiss pursuant to FED. R. CIV. P. 12(b)(6) are deemed moot.

### INTRODUCTION

In April 1999, the Forney Independent School District, through the auspices of the School Board, inaugurated a mandatory school uniform policy applicable to each of the nearly 2,500 students in the four schools which comprise the district. The uniform policy was implemented at the beginning of the 1999–2000 school year. Objecting to the uniform policy on philosophical and religious bases, Plaintiffs, who are students enrolled in the Forney I.S.D. and their parents, filed this action under the provisions of 42 U.S.C. § 1983 against the school district, its trustees and its superintendent, alleging that the mandatory policy violated their individual constitutional rights.

### FACTS AND PROCEDURAL HISTORY

In 1995, the Texas Legislature enacted TEX. EDUC. CODE ANN. § 11.162, which authorizes local school districts to adopt mandatory student uniform policies. Section 11.162 provides, inter alia:

(a) The board of trustees of an independent school district may adopt rules that require students at a school in the district to wear school uniforms if the board determines that the requirement would improve the learning environment at the school.

. . . .

(c) A parent or guardian of a student assigned to attend a school at which students are required to wear school uniforms may choose for the student to

be exempted from the requirement or to transfer to a school at which students are not required to wear uniforms and at which space is available if the parent or guardian provides a written statement that, as determined by the board of trustees, states a bona fide religious or philosophical objection to the requirement.

Acting pursuant to the authority of the state enabling statute, Defendant St. Clair, the Forney school superintendent, explored the possibility of implementing such a policy at the Forney schools.[1] St. Clair reviewed the uniform policies employed by other school districts, along with studies on the efficacy of school uniforms and anecdotal evidence. St. Clair came to the conclusion that the implementation of a school uniform program would, according to his research, have the following beneficial effects on the students and the system as a whole: improve student performance, instill self-confidence, foster self-esteem, increase attendance, decrease disciplinary referrals, and lower drop-out rates.

In March 1999, students were sent home with a survey designed to get parental feedback to the school uniform proposal.[2] Thirty-four percent of the parents responded and, of those, approximately sixty percent were in favor of school uniforms. Additionally, "town meetings" were held at the schools, where copies of the proposed uniform code were distributed to members of the public, and parents were provided the opportunity to discuss the proposal with school administrators. The matter was then submitted to the School Board for consideration. The School Board made factual findings that school uniforms would improve the learning environment at the schools and that the proposed policy would

further that goal. On April 19, 1999[3], the board approved the uniform policy, which was scheduled to take effect at the beginning of the 1999–2000 school year.

While for several years the students at Forney I.S.D. were subject to a school dress code, the new uniform policy requires the students to wear a limited choice of apparel during school hours. For example, boys are required to wear khaki or navy blue pants or shorts, and a choice of a white, red, yellow, or blue collar shirt, either short or long sleeve. Girls are afforded similar color choices, and they may wear skirts or "jumpers" of a prescribed length. Denim, leather, suede, or similar material is not permitted to be worn, except as an outer-garment such as a jacket or coat. Students are not permitted to wear any clothing in a manner suggesting gang affiliation and manufacturer logos are limited in size. The principal of each school may, at his discretion and from time to time, designate a "non-uniform" day.

The policy includes an "opt-out" provision whereby students, through their parents, can apply for an exemption from the policy based upon philosophical or religious objections, or upon medical necessity. Parents who object to the policy are asked to complete a questionnaire concerning the basis of their protestations. The questionnaire is designed to elicit information as to the sincerity of the beliefs of those parents who assert objections. Further, as a component of the uniform policy, the School Board established a three-step grievance procedure whereby opt-out requests are initially considered by the principal of the respective school. If the request is denied, the parent may seek a review of their request by the school su-

---

1. Plaintiffs expressly do not challenge the constitutionality of § 11.162.

2. Because of time constraints related to the need to receive survey responses before the end of the 1999 school year, students at the Forney High School were not given the surveys. However, parents of Forney High

School students were given the opportunity to participate in "town meeting" discussions concerning the uniform policy.

3. The minutes of the School Board meeting on that date reflect that the uniform policy was adopted by the trustees on the second reading.

perintendent. A denial by the superintendent may then be reviewed by the School Board at its regular meeting. If the opt-out request is not granted by the School Board, the parent may appeal the decision to the Texas Education Agency. Finally, if the parent is not granted an exemption from the uniform policy through administrative review, he or she may seek redress in state court.[4] While pursuing their exemption request through the grievance process and on appeal, the students are not required to wear the prescribed uniform.

Through the use of the questionnaire and the grievance procedure, the School Board seeks to ascertain *bona fide* philosophical or religious objections to the uniform policy. However, many Plaintiffs refused to complete the questionnaire or failed to advance their claim through the grievance procedure. The parents of seventy-two children sought exemptions from compliance with the uniform policy, of which twelve were granted, including Plaintiffs Jonathan Becmer, Jeremiah Duckworth, Clayton Duckworth, and Madeline Lowery. The applications of the students who were denied exemptions based on philosophical objections, were denied because they indicated that those students had worn some type of uniform in the past, for example, as a member of the football or softball team, girl scouts, school mascot costume, or a uniform required by virtue of their employment.

Finding no relief from the uniform policy through administrative channels, Plaintiffs filed this § 1983 action, seeking to enjoin the School Board from applying the uniform policy to them, and requesting from the Court a declaration that the Forney school uniform policy is unconstitutional. Plaintiffs also seek damages and attorney's fees.

In response, Defendants filed two motions to dismiss pursuant to FED. R. CIV. P. 12(b)(6), contending that Plaintiffs have failed to state a claim upon which relief can be granted. Defendants also moved for summary judgment in accordance with FED. R. CIV. P. 56. In each of the motions, the individual Defendant school officials assert the defense of qualified immunity and seek dismissal on that basis as well. Inasmuch as the parties have submitted documentary evidence in connection with all of the pending motions combined, the Court will treat Defendants' Rule 12(b) motions to dismiss as motions for summary judgment, in accordance with that rule.

## STANDING

As a threshold issue, the Court must address Defendants' contention that Plaintiffs lack standing to assert their claims. Defendants suggest that Plaintiffs have not presented a justiciable "case or controversy" for consideration by the Court and that it is not within the power of this Court under Article III of the United States Constitution to adjudicate this dispute. Specifically, Defendants submit that Plaintiffs have failed to show that they have suffered any injury as a result of the implementation of the school uniform policy. None of the Plaintiff students have been suspended or expelled from school for failing to abide by the uniform policy. Therefore, there is no cognizable injury.

■■■ Article III, section 2, of the Constitution limits the adjudicative power of federal courts to "Cases" or "Controversies." Persons who do not present such a case or controversy lack standing to litigate their dispute in federal court. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Thus, in order to establish standing, a party must show " 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or im-

---

**4.** Plaintiffs do not contest the validity of the grievance procedures employed by the School Board.

minent.'" *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Citing *Nevares v. San Marcos Consolidated I.S.D.,* 111 F.3d 25 (5th Cir.1997), Defendants argue that Plaintiffs do not have a constitutional right to attend a particular school. Therefore, Plaintiffs cannot complain that they will suffer injury if they refuse to abide by the uniform policy, since they do not have a right to attend a particular school in the first instance.

■ The *Nevares* decision is inapposite. While the United States Court of Appeals for the Fifth Circuit there held that students do not have a protected interest in attending a *particular* school, it did not hold that students do not have a right to attend school. Indeed, the *Nevares* court cited *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), wherein the Supreme Court earlier held that protected property interests are not normally created under the federal Constitution; rather, they are created by state law and protected by the federal due process clause. The *Goss* Court determined that, where the state has statutorily created a right to a free public education, the state is "constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause . . . ." *Id.* Likewise, in the instant case, Texas has established an entitlement to free public education. *See* TEX. EDUC. CODE ANN. § 25.001. Indeed, unless otherwise exempt, children are required by state law to attend school. TEX. EDUC. CODE ANN. § 25.085. Therefore, under *Goss,* Plaintiff students have a right to attend a Forney school appropriate for their grade level.

■ Plaintiffs have alleged that the uniform policy implemented at the Forney I.S.D., at which attendance is compulsory, violates their asserted rights under the Constitution. Moreover, the Forney

I.S.D. Student Uniform Policy specifically provides that if a student persists in his refusal to comply with the uniform policy, his ultimate sanction is the alternative education program *or expulsion.* Thus, it is apparent that the penalty of expulsion from school may be imposed on those students who, for whatever reason, refuse to wear the prescribed uniform. Moreover, Plaintiffs seek remedies, including damages, for injuries which have already occurred. Accordingly, the Court concludes that Plaintiffs have established a particularized, imminent or actual injury, for purposes of Article III. Therefore, they have the requisite standing to assert their claims.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant bears the burden of establishing the propriety of summary judgment, and all pleadings and evidence are viewed in the light most favorable to the nonmovant. *Melton v. Teachers Ins. & Annuity Ass'n of America,* 114 F.3d 557, 559 (5th Cir.1997). As such, the movant must inform the court of the basis of its motion and identify the portions of the record which reveal there are no genuine material fact issues. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The function of the court, therefore, is to make the threshold inquiry of determining whether there is a need for a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[5]

Once the movant makes this showing, the nonmovant must demonstrate that there is evidence in the record establishing

---

**5.** *See also Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) ("Summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial.").

that there is a genuine issue of material fact for trial. *Id.* at 323–24, 106 S.Ct. 2548. To carry this burden, the opponent must do more than simply show some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute as to a material fact is "genuine" under Rule 56(c) only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to preclude a grant of summary judgment. *Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir.1999). The opponent must present evidence sufficient to support a resolution of the factual issue in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The court may properly enter summary judgment against a party if that party fails to establish the existence of an element essential to the case and as to which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 324–26, 106 S.Ct. 2548. Summary judgment is also appropriate when the only issues to be decided in the case are issues of law, as in the instant case, or when the non-moving party's claims are legally deficient. *Neff v. American Dairy Queen Corp.,* 58 F.3d 1063, 1065 (5th Cir.1995); *Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1257 (5th Cir.1995).

### PLAINTIFFS' CONSTITUTIONAL CLAIMS

Plaintiff students contend that the Forney school uniform policy violates their constitutional right of free speech by suppressing their expressions of individuality and uniqueness, while requiring them to display a contrary message, namely, conformity, through the visual medium of the uniforms themselves. Additionally, the students complain that the policy impedes their liberty interest in wearing the clothing of their choice while at school. Similarly, Plaintiff parents allege that the policy, which, by definition, limits their ability to select the clothing worn by their children while at school, impermissibly encroaches on their constitutional right to direct the upbringing and education of their children. Plaintiffs also assert that the mandatory uniform policy prohibits the free exercise of their religion, inasmuch as the policy is in conflict with the students' preferred manner of dress, which is directed by their respective religious beliefs. Finally, Plaintiffs argue that the questionnaire employed by the School Board to obtain information concerning Plaintiffs' objections to the policy constitutes an impermissible inquiry into Plaintiffs' philosophical and religious beliefs.

Plaintiffs suggest that the source of the foregoing rights emanate from the First, Ninth, and Fourteenth Amendments to the Constitution. Thus, Plaintiffs' array of challenges to the Forney school uniform policy implicates several constitutional provisions, which, accordingly, necessitates an examination of the contours of each asserted right.

### FREE SPEECH

The First Amendment prohibits Congress from abridging the freedom of speech. That prohibition is extended to the states by virtue of the Fourteenth Amendment. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). While it literally forbids the abridgement of "speech," the protections of the First Amendment extend to expressive conduct as well. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). However, with respect to conduct, the Supreme Court has cautioned: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at 376, 88 S.Ct. 1673. Accordingly, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."

*Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

■ Thus, the initial inquiry is whether the conduct in question can be characterized as "speech" for purposes of First Amendment analysis. To that end, the Court must consider whether the activity is "sufficiently imbued with elements of communication," so as to fall within the protective scope of the First Amendment. *Spence v. State of Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). To help identify expressive conduct, the Supreme Court has fashioned a two-part test, which requires courts to determine: (1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it. *Id.* at 410–411, 94 S.Ct. 2727; *Johnson,* 491 U.S. at 404, 109 S.Ct. 2533. It is critically important to examine the nature of the activity, combined with the factual context in which it was undertaken. *Spence,* 418 U.S. at 409–410, 94 S.Ct. 2727; *Cabrol v. Town of Youngsville,* 106 F.3d 101, 109 (5th Cir.1997).

■ In the context of public education, First Amendment rights are applied in light of the special characteristics of the school environment. *Tinker v. Des Moines Ind. Comm. School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Thus, while it is true that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *id.,* it is equally true "that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Stated otherwise, "a school need not tolerate student speech that is inconsistent with its 'basic educational mission' [citation omitted], even though the government could not censor similar speech outside the school." *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (citing *Fraser,* 478 U.S. at 685, 106 S.Ct. 3159). This is so, as the Supreme Court has observed, because the quintessential objective of public education is the "inculcation of fundamental values necessary to the maintenance of a democratic political system." *Fraser,* 478 U.S. at 681, 106 S.Ct. 3159 (quoting *Ambach v. Norwick,* 441 U.S. 68, 76–77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979)). Therefore, "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Fraser,* 478 U.S. at 683, 106 S.Ct. 3159; *Kuhlmeier,* 484 U.S. at 267, 108 S.Ct. 562.

■ Likewise, expressive conduct in the school environment may be constitutionally circumscribed where it is inconsistent with the mission of primary and secondary school education. *Karr v. Schmidt,* 460 F.2d 609, 613–614 (5th Cir. 1972); *Lansdale v. Tyler Junior College,* 470 F.2d 659, 663 (5th Cir.1972); *Ferrell v. Dallas Ind. School Dist.,* 392 F.2d 697, 702–703; *Domico v. Rapides Parish School Bd.,* 675 F.2d 100 (5th Cir.1982) (holding that school employee hairstyle regulations contained in dress code were constitutionally permissible). The Fifth Circuit has described the governing authority's interest in maintaining an effective and efficient school system as "compelling" and "of paramount importance." *Ferrell,* 392 F.2d at 703. In upholding a school hair length regulation, the *Ferrell* court further observed:

That which so interferes or hinders the state in providing the best education possible for its people, must be eliminated or circumscribed as needed. This is true even when that which is condemned is the exercise of a constitutionally protected right.

*Id.*

In *Karr,* the Fifth Circuit sitting *en banc,* upheld another school regulation pertaining to hair and grooming. There, the plaintiff was prohibited from enrolling

in school because his hair length was in excess of the maximum length prescribed by the grooming regulation. In response, he sued the principal and the school board, contending that his hair style was symbolic speech by which he expressed his individuality, and that the school regulation unconstitutionally suppressed that message. *Id.* at 613. The *Karr* court stated the issue presented as follows: "Is there a constitutionally protected right to wear one's hair in a public high school in the length and style that suits the wearer?" *Id.* The court held that "no such right is to be found within the plain meaning of the Constitution." *Id.* In beginning its analysis, the *Karr* court reaffirmed its earlier determination in *Ferrell* that the interest of the state in maintaining an effective and efficient school system is "compelling." *Id.* at 612. Ultimately, the court concluded that the plaintiff's conduct (wearing long hair) was not imbued with sufficient communicative content to fall within the protection of the First Amendment.

Given the compelling state interest in promoting educational goals, compared with the minimal intrusion on the plaintiff's rights, the *Karr* court announced a *per se* rule that such regulations are constitutional. *Id.* at 617–618. Appreciating the myriad of school regulations pertaining to student appearance which were subject to attack, the court recognized that federal courts have more urgent tasks to perform than to supervise the affairs of local school boards. Thus, the court decreed:

> Henceforth, district courts need not hold an evidentiary hearing in cases of this nature. Where a complaint merely alleges the constitutional invalidity of a high school hair and grooming regulation, the district courts are directed to grant an immediate motion to dismiss for failure to state a claim for which relief can be granted.

*Id.*

However, in *Tinker*, the Supreme Court invalidated a school policy which forbade students from wearing black armbands at school. *Tinker*, 393 U.S. at 514, 89 S.Ct. 733. There, the Court specifically noted that the armbands were worn by the students to criticize the Vietnam war. *Id.* at 504, 89 S.Ct. 733. Under those circumstances, wearing the armbands was a symbolic act of political protest and, thus, it was similar to "pure speech," which is entitled to "comprehensive protection under the First Amendment." *Id.* at 505–506, 89 S.Ct. 733.

At the heart of the *Tinker* decision is the Supreme Court's analysis of the context in which the conduct occurred, along with the circumstances surrounding the adoption of the "antiarmband" policy by the school authorities. The students made known their intention to wear the armbands to school to protest the war. The school authorities became aware that the students would be wearing the armbands and hastily adopted the armband regulation only two days before the planned protest. *Id.* at 504, 89 S.Ct. 733. Moreover, the Court found it relevant to its analysis that the school authorities did not ban the wearing of other political symbols, such as campaign buttons and the Iron Cross, which is associated with NAZI party affiliation; rather, the only banned symbols were the black armbands. *Id.* at 510–511, 89 S.Ct. 733. Furthermore, the Court observed that the peaceful demonstration by the students did not portend violence, such that school officials had no cause to believe that wearing the armband would cause a disruption. Clearly then, the Court placed a premium on (1) the intent of the students to display a symbol of *political protest*, and (2) the disingenuous adoption of the regulation by school officials to prohibit only that symbolic act. It is clear that the school officials in *Tinker* sought to control the *content* of the students' speech, notwithstanding their contentions otherwise.

Further narrowing the scope of its holding, the *Tinker* Court stated, "The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or

deportment.... Our problem involves direct, primary First Amendment rights akin to 'pure speech.' " *Id.* at 507–508, 89 S.Ct. 733. Thus, the Court's invalidation of the school armband regulation was premised on the notion that political speech, which is intended and understood by others as such, is deserving of the highest protection afforded by the First Amendment. However, the Court reiterated its recognition that school authorities generally exercise great latitude in regulating student conduct: "On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of local school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. 733.

With the foregoing principles in mind, the Court turns to the facts of the instant case. Plaintiff students simply contend that they have a First Amendment right to express their individuality by wearing the clothing of their choice to school. To determine the existence *vel non* of such a right, the first inquiry, as earlier noted, is whether the mere wearing of particular clothing is sufficiently imbued with elements of communication to bring that conduct within the ambit of the First Amendment.

Employing the *Spence* test, *ante,* the Court looks to whether Plaintiff students intended to convey a particularized message by wearing their chosen mode of dress, and, if so, whether the likelihood was great that the message would be understood by those who viewed it. *Id.* at 410–411, 94 S.Ct. 2727. The students claim that they intended to convey their individuality by virtue of their particular clothing. Further, they state that the wearing of their preferred clothing is an expression of their opposition to the uniform policy. The Court need not determine whether the students subjectively intended to express their individuality. Thus, for purposes of analysis, the Court will assume their intent, which satisfies the first part of the *Spence* test.

■ However, the Court reaches a different conclusion with respect to the likelihood that others would understand the students' message of individuality. While it may be generally true that every facet of life has symbolic meaning, it certainly does not follow that the clothing which one wears is a readily identifiable proclamation to the world of one's individuality. Indeed, it is axiomatic that everyone is different. But the mere fact of existence does not imbue one with First Amendment speech rights. The Supreme Court has observed, "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). Here, by merely wearing the clothes of their choice, it cannot be said that Plaintiff students were communicating a *particularized* message which would have a great likelihood of being understood by others. *See Cabrol,* 106 F.3d at 109 (finding no expressive conduct in the plaintiff's daily activity of maintaining chickens in his yard after being prohibited from doing so by local ordinance); *Bivens v. Albuquerque Public Schools,* 899 F.Supp. 556, 560–561 (D.N.M.1995) (concluding that student's wearing of sagging pants did not amount to constitutionally protected speech); *Olesen v. Bd. of Ed. of School Dist. No. 228,* 676 F.Supp. 820, 822 (N.D.Ill.1987) (determining that wearing of earring by a male student to express his "individuality" was not a "message" within the protective scope of the First Amendment).

The Supreme Court's rejection of the notion that an apparently limitless variety of conduct can be labeled "speech," applies with even greater force in the public school environment, where the state's interest in promoting education is undeniably compel-

ling. The instant case is closely analogous to *Karr*. It is insufficient and myopic to distinguish *Karr* on the basis that its holding related to grooming regulations, whereas here the offending policy relates to dress. It is apparent that hair length restrictions and clothing requirements originate from the governing authority's ability to regulate a student's appearance while at school, provided that the policy is facially neutral and generally applicable. Further, the hair length restriction which was upheld in *Karr* is a greater, but acceptable intrusion on the students' rights, although it is more permanent. *See Bivens*, 899 F.Supp. at 560 n. 7 ("[I]t should be noted that hair length, in contrast to sagging pants, is a relatively permanent condition that stays with a student after he or she exits the schoolhouse gates.").

Unlike the facts presented in *Tinker*, the conduct of Plaintiff students in the instant case does not contain the requisite elements of communication to cloak it with the protection afforded by the First Amendment. In *Tinker*, the black armbands were overtly symbolic of the students' protest of the Vietnam War. That message was received loudly and clearly by others, including school administrators, who sought to suppress that message. Here, however, any message conveyed by the Plaintiff students was not such that reasonable persons would have understood its meaning. To an onlooker, a student wearing blue jeans and a t-shirt may be perceived as conveying "I'm confident" or "My other clothes are dirty," or any other conceivable message other than "I'm an individual." In addition, the uniform policy was facially-neutral and generally applicable to all students. Plaintiffs do not contend that the policy was enacted for an improper purpose. The policy was adopted to improve student performance and to ultimately further the educational goals of the school district.

Plaintiffs also assert that, by being required to wear the uniform, they are being compelled to communicate a message that they deem repugnant—conformity. However, Plaintiffs' contention in this regard is merely the same argument advanced earlier from a different perspective. That is to say, once the Court has determined that there is no communicative element to the students' clothing, the same result obtains with respect to school uniform clothing. Thus, the clothing authorized by the uniform policy is no more expressive than the clothing selected by the students. Furthermore, the school uniforms do not become imbued with elements of communication simply because of the School Board's stated reasons for adopting the policy— improving student performance and the like. The potential benefits of the policy cannot be construed as an intent to *express* those benefits. Even so, there is not a great likelihood that others will perceive a message of "conformity" emanating from the students who wear the uniform. Simply stated, Plaintiff students do not communicate a constitutionally prohibitive (or protected) message merely by wearing clothing authorized by the school uniform policy.

Finally, Plaintiff students complain that the questionnaire used to determine the basis for their objections to the uniform policy was unconstitutionally intrusive. Plaintiffs claim that the School Board does not have a right to gather information concerning Plaintiffs' beliefs, whether philosophical or religious, to determine whether Plaintiffs are eligible for an exemption from the policy. By doing so, they contend, the School Board is conditioning the students' free speech rights on the "arbitrary determination" that the student is sincere in his beliefs. Plaintiffs' complaint alleges that the Texas Education Code does not require or authorize the use of the questionnaire, or any other inquiry into Plaintiffs' beliefs, as a condition of allowing them to opt-out of the uniform policy. They contend that the questionnaire is "but a sham" to evade the exemption requirements of the state statute.

■ The Court concludes that this free speech claim fails as a matter of law. Initially, the Court notes that Plaintiffs expressly state that they are not attacking the procedural aspects of the opt-out process, which presumably would include all facets of the procedure, including the questionnaire.[6] Accordingly, Plaintiffs cannot protest the alleged "arbitrary decisions" by the School Board. Further, Plaintiffs do not point to any applicable authority to suggest that they may refuse to comply with opt-out procedures, then complain that their opt-out request was denied. It is ludicrous to suggest that the questionnaire or the grievance procedure, whereby Plaintiffs are afforded the opportunity to voice their objections to the uniform policy, is somehow restrictive of speech. To the contrary, Plaintiffs are encouraged to fully inform the School Board of the basis of their objections. The questionnaire, then, is fully consistent with the free speech clause. That Plaintiffs are given the opportunity to explain their objections, but refuse to do so, cannot be laid at the feet of the School Board. Moreover, the state enabling statute, which Plaintiffs do not attack, authorizes exemptions for *bona fide* philosophical or religious beliefs. It is obvious, therefore, that the School Board must have some basis for determining a claim for exemption, just as a student must present a note from his parent for being absent from class.

In their final free speech argument, Plaintiffs contend that the uniform policy was an improper "prior restraint" on their speech. The speech to which Plaintiffs refer is the wearing of clothes of their choice, as discussed above. However, because the Court has concluded that Plaintiff students' conduct was not speech under the First Amendment, it necessarily follows that any action taken by the School Board with respect to the students' non-speech conduct was not a "prior restraint" of speech, and therefore not violative of the free speech clause.

■ Having concluded that the school uniform policy does not implicate Plaintiffs' free speech rights, it is clear that *Karr* mandates dismissal of those claims. However, notwithstanding the clear directive to dismiss, the Court in any case concludes that the uniform policy meets the rational basis test set forth in *Karr. See id.* at 616 (stating that the standard of review is whether the regulation is reasonably intended to accomplish a constitutionally permissible objective). While the burden is on Plaintiffs to establish that the policy is "wholly arbitrary," *id.* at 617, the School Board has clearly established that the policy was adopted to further the legitimate, indeed compelling, goal of improving the learning climate at the Forney schools.

■ Moreover, whether the decision to implement school uniforms is the best or worst method of achieving that goal is not subject to review by the Court. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (holding that "States are not required to convince the courts of the correctness of their legislative judgments."); *Qutb v. Strauss,* 11 F.3d 488, 493 n. 7 (5th Cir.1993) ("Federal courts have always been reluctant to question the potential effectiveness of legislative remedies designed to address societal problems."); *Schleifer v. City of Charlottesville,* 159 F.3d 843, 849 (4th Cir.1998) (The "uncertain nature of remedial legislation is no reason for courts to fashion their own cures . . . . Whether we as judges subscribe to these theories is beside the point. Those elected officials with their finger on the pulse of their home community clearly did.").

---

6. In Plaintiffs' response to Defendants' motion for summary judgment, they state: "However unfair this [grievance] procedure may have been, Plaintiffs are not before this Court on a procedural due process claim.

The controlling issue in this case is whether Defendants may force a student to wear a uniform against the wishes of the student and his/her parents."

Accordingly, the Court concludes that the Forney school uniform policy does not violate Plaintiffs' free speech rights under the First Amendment. There being no genuine issue of material fact as to those claims, Defendants are entitled to judgment as a matter of law.

### DUE PROCESS

The due process clause of § 1 of the Fourteenth Amendment to the United States Constitution provides, *inter alia:* "No State shall ... deprive any person of life, liberty, or property, without due process of law." That provision has been interpreted to afford not only procedural guarantees against the deprivation of "liberty," but also a substantive aura of protection against constitutionally impermissible restrictions by the state or its subdivisions. *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Supreme Court has recognized that some personal liberties are of such constitutional significance that they are deemed "fundamental," including the right to marry, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to bear children, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); of marital privacy, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); and to abortion, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

Some rights protected by the due process clause have also been characterized as "privacy interests" emanating from the "penumbra" of other textual sources of the constitution—most notably, the First and Ninth Amendments. *See Griswold,* 381 U.S. at 484, 85 S.Ct. 1678; *id.* at 486–499, 85 S.Ct. 1678 (Goldberg, J., concurring). However, the Supreme Court has stated that there is no meaningful or substantive distinction between the various constitu-

tional sources of such rights. *See Runyon v. McCrary,* 427 U.S. 160, 179 n. 15, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (noting that parental rights and privacy rights "may be no more than verbal variations of a single constitutional right."). The analyses of such rights are the same, whether arising from the due process clause or the other cited sources. Indeed, the jurisprudence cited in this Court's discussion of Plaintiffs' rights, below, invariably attributes the source of such rights to the due process clause of the Fourteenth Amendment. As such, the Court will analyze Plaintiffs' privacy right claims in light of the prevailing due process jurisprudence. Thus, the Court must determine whether Plaintiffs have presented liberty interests cognizable under the due process clause.[7]

Plaintiffs' due process claims consist of two collateral components: Plaintiff students' asserted right to wear the clothing of their choice while at school, and Plaintiff parents' right to direct the upbringing and education of their children. The Court will examine each component separately.

### Students' Liberty Interest

The Fifth Circuit has recognized that there is a general liberty interest in choosing how to wear one's hair; however, that right does not rise to the level of fundamental significance. *Lansdale,* 470 F.2d at 663; *Domico,* 675 F.2d at 101. Furthermore, the Fifth Circuit has expressly declined to recognize as fundamental, the right of public school students to wear their hair as they please. *Karr, supra,* 460 F.2d at 615. "It is our firm belief that this asserted freedom does not rise to the level of fundamental significance which would warrant our recognition of such a substantive constitutional right." *Id.* In so concluding, the *Karr* court succinctly explained the relative nature of individual liberties:

> We think it plain that individual liberties may be ranked in a spectrum of importance. At one end of the spectrum

---

7. Plaintiffs expressly do not assert procedural due process claims.

are the great liberties such as speech, religion, and association specifically guaranteed in the Bill of Rights. Of equal importance are liberties such as the right of marital privacy that are so fundamental that, even in the absence of a positive command from the Constitution, they may be restricted only for compelling state interests. At the other end of the spectrum are the lesser liberties that may be invaded by the state subject only to the same minimum test of rationality that applies to all state action.

*Karr,* 460 F.2d at 615.

Balancing the interests of the student and the school authorities, the *Karr* court determined that the intrusion on the students' liberty interest was "temporary and relatively inconsequential," while the school's interest in maintaining decorum and deportment was substantial: "We feel compelled to recognize and give weight to the very strong policy considerations in favor of giving local school boards the widest possible latitude in the management of school affairs." *Id.* at 615. Having concluded that the right of a student to wear his hair as he pleases does not merit heightened scrutiny as a fundamental right, the *Karr* court applied the rational basis test to the hair length regulation and determined that it was "reasonably intended" to accomplish a legitimate state objective. *Id.* at 616.

■■■ As earlier noted, the reasoning of *Karr* can be easily applied to the instant case. The school uniform policy is similar to the hair length restrictions in *Karr.* Each causes minimal intrusion on the students' liberty interests, while serving a legitimate educational objective. This Court has earlier observed that hair length restrictions, unlike school uniforms which may be taken off at the end of the school day, are more intrusive, yet they have been upheld by the Fifth Circuit. Thus, *a fortiori,* the Forney school uniform policy does not unconstitutionally encroach on Plaintiff students' due process rights.

Finally, Plaintiffs, both students and parents, allege the deprivation of their liberty interest in preventing the disclosure of private information concerning their respective philosophical beliefs. They contend that the questionnaire and the grievance procedure, whereby they are allowed to explain their objections to the uniform policy, unconstitutionally intrude into their private affairs. In support of their argument, Plaintiffs cite *Fadjo v. Coon,* 633 F.2d 1172 (5th Cir.1981), where the Fifth Circuit observed that the liberty interest in privacy is composed of two notions: the freedom from being required to disclose personal matters to the government and the freedom to make certain types of decisions without government interference. *Fadjo,* 633 F.2d at 1175. Here, Plaintiffs simply do not want to explain their beliefs to the School Board for purposes of applying for an opt-out. In such cases, *Fadjo* mandates that the courts "must balance the invasion of privacy alleged by [the plaintiff] against any legitimate interests proven by the state." *Id.* at 1176. The *Fadjo* court further stated that, because a constitutional right was presented, "more than mere *rationality* must be demonstrated" by the state. *Id.* (quoting *Plante v. Gonzalez,* 575 F.2d 1119, 1134 (1978)).

In *American Civil Liberties Union of Miss. v. State of Miss.,* 911 F.2d 1066 (5th Cir.1990), the Fifth Circuit considered the privacy right of citizens to prevent disclosure of intimate information about them surreptitiously gathered during the 1950s and 1960s, by a state commission devoted to perpetuating segregation. *Id.* at 1067–1068. Much of the information was disparaging and highly personal, and included allegations of homosexuality, child molestation, illegitimate births, sexual promiscuity, drug abuse, and extreme political and religious views. *Id.* at 1070. There, the court relied on *Fadjo,* but employed the rational basis test in allowing limited disclosure. *ACLU v. Miss.,* 911 F.2d at 1070 ("An intrusion into the interest in avoiding disclosure of personal information will thus

only be upheld when the government demonstrates a legitimate state interest which is found to outweigh the threat to the plaintiff's privacy interest."). *Id.* (quoting *Fadjo,* 633 F.2d at 1176).

The Supreme Court has held that state laws which require physicians to provide information concerning their patients' controlled substance prescriptions do not implicate a privacy right recognized by the due process clause. *Whalen v. Roe,* 429 U.S. 589, 603–604, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The plaintiffs in *Whalen,* doctors and patients, argued that the state reporting requirement interfered with their privacy right to make decisions concerning their health. *Id.* at 599–600, 97 S.Ct. 869. Nevertheless, without utilizing heightened scrutiny, the *Whalen* court upheld the reporting requirement as a reasonable exercise of the state's police power. *Id.* at 598, 97 S.Ct. 869.

 In this case, it is clear that neither the questionnaire nor the grievance procedure compel a constitutionally prohibitive disclosure of personal information. First, Plaintiffs who refused to respond to the questionnaire and did not seek an opt-out through the grievance procedure, did not reveal any information and, thus, their claims have no legal merit. The School Board's request for information, which was ultimately refused by Plaintiffs, does not present a constitutional violation. Second, as to those who acceded to the School Board's request and supplied information, the Court concludes that the information provided did not invade their right of privacy. The questionnaire was simply used to elicit minimal information concerning the basis of Plaintiffs' objections to the uniform policy, and it was used only for the purpose of determining whether an exemption was warranted. As earlier noted, the School Board's interest in maintaining an effective and efficient school system is not only legitimate, but "compelling" and "of paramount importance." *Ferrell,* 392 F.2d at 703. Balancing the minimal intrusion on Plaintiffs' privacy interests with the significant interest of the School Board in achieving its educational goals, the Court concludes that Plaintiffs' due process claims arising out of disclosure of personal information must likewise fail.

### Parental Rights

Plaintiff parents' due process claims are premised on the concept that parents have a recognized constitutional right to direct the upbringing and education of their children. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). However, while Plaintiffs' asserted rights may be generally characterized as "parental rights," it is important to note that their claims more particularly arise within the context of public education. The Supreme Court has indicated that the " '[s]ubstantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' " *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (quoting *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *see also Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Bowers v. Hardwick,* 478 U.S. 186, 191, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). "It is important, therefore, to focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake ...." *Collins,* 503 U.S. at 125, 112 S.Ct. 1061. Thus, the Court must examine the particular right advanced by Plaintiffs, namely, the right to send their children to school in the clothes of their choice.

The *Meyer/Pierce/Yoder* trilogy is the touchstone for the Court's analysis of Plaintiffs' claims. The *Meyer* decision laid

the foundation for the Supreme Court's later explications of the right of parents to direct the upbringing and education of their children. There, a parochial school instructor was convicted of teaching German under a Nebraska statute which made it a misdemeanor to teach a student any language other than English. In examining the parameters of the due process clause, the Court stated, "Without doubt, [the Fourteenth Amendment] denotes not merely freedom from bodily restraint but also the right of the individual ... to marry, establish a home and bring up children ... and generally enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer*, 262 U.S. at 399, 43 S.Ct. 625. Thus, the state may not interfere with those individual liberties "under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect." *Id.* at 399, 43 S.Ct. 625.

Two years after *Meyer*, the Supreme Court in *Pierce* considered whether a state may prohibit parents from sending their children to a private school. The offending statute in question required all parents having custody of school-age children to send them to a public school. *Pierce*, 268 U.S. at 530, 45 S.Ct. 571. Relying on its decision in *Meyer*, the Court held that the statute "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534–535, 45 S.Ct. 571. The *Pierce* Court further affirmed that such rights may not be abridged by state legislation "which has no reasonable relation to some purpose within the competency of the state." *Id.* Finally, the Court also recognized for the first time the important state interest in providing public education: "No question is raised concerning the power of the state to reasonably regulate all schools, to inspect, supervise and examine them ...." *Id.* at 534, 45 S.Ct. 571.

Nearly fifty years after *Pierce*, the Supreme Court decided *Yoder*—its most revealing examination of the confluence of parental rights and the substantial state interest in public education. The *Yoder* Court invalidated a Wisconsin statute that required children to attend a public or private school until the age of sixteen. Plaintiffs were members of the Amish faith, whose religious beliefs prohibited them from allowing their children to attend school beyond the eighth grade. The parents insulate their children from formal education and other worldly influences after they acquire fundamental reading and math skills, in order to inculcate Amish attitudes and beliefs through home-based vocational training, the object of which is to prepare them for the role of farmer or housewife. *Yoder*, 406 U.S. at 211, 92 S.Ct. 1526. This value-shaping, informal educational experience is a necessary rite of passage for Amish youth. The training of their children is a central tenet of the Amish faith, which has been practiced by the Amish in a substantially unchanged fashion for three hundred years. *Id.* at 219, 92 S.Ct. 1526.

While *Yoder* was decided on the free exercise of religion clause of the First Amendment, the Supreme Court clearly premised its holding in part on the "interests of parenthood." *Id.* at 233, 92 S.Ct. 1526. The Court also acknowledged the substantial state interest in providing and regulating a public educational system: "There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. [Citation omitted.] Providing public schools ranks at the very apex of the function of a State." *Id.* at 213, 92 S.Ct. 1526. However, the Court also noted that the parents' right to guide their children's religious upbringing and education has "a high place in our society." *Id.* at 213–214, 92 S.Ct. 1526. Citing *Meyer* and *Pierce*, the Court concluded that

the Wisconsin compulsory education law was unconstitutional as it applied to the Amish children.

Understanding the full import of *Yoder*, which refined the parental rights announced in *Meyer* and *Pierce*, is critical to properly analyze the claims presented in the present case. In *Yoder*, the Supreme Court, while reaffirming the general notion that parental rights are a protected liberty interest under the due process clause, recognized the "high responsibility" and regulatory power of the state in matters of public education. Furthermore, while fundamental religious practices may excuse parents from complying with educational policies, secular objections to such policies are insufficient to avoid compliance. The Court was very specific in framing its holding:

> We come then to the *quality* of the claims of the respondents . . . . In evaluating those claims we must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations . . . . [T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.

*Yoder*, 406 U.S. at 215–216, 92 S.Ct. 1526 (emphasis added).

Thus, while the Court stated in general terms that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion," *id.* at 215, 92 S.Ct. 1526, considering the quality of the claims before it, the Court concluded: "[W]hen the interests of parenthood are combined with a free exercise claim *of the nature revealed by this record*, more than a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's

requirement under the First Amendment." *Id.* at 233, 92 S.Ct. 1526 (emphasis added) (quoting *Pierce*, 268 U.S. at 535, 45 S.Ct. 571). While the Court employed more than a rational basis standard with reference to the First Amendment free exercise clause, it is clear that the due process interest of parents to direct the upbringing and education of their children, standing alone, warranted no more than rational basis review. The standard was elevated only because of the free exercise aspect of the parents' claims because, as earlier noted, the secular aspect of their claim (implicating due process) will not overcome a reasonable educational regulation. Thus, *Yoder* dictates that this Court apply a rational basis standard of scrutiny to the uniform policy in the instant case. *See Herndon v. Chapel Hill–Carrboro City Bd. of Ed.*, 89 F.3d 174, 178–179 (4th Cir.1996) (tracing the lineage of *Yoder* and concluding that due process claims involving parental rights in the school context warrant only rational basis scrutiny); *Immediato v. Rye Neck School Dist.*, 73 F.3d 454, 461–462 (2d Cir.1996) (holding that rational basis scrutiny applied to parents' due process objection to a mandatory, community service curriculum requirement adopted by the school board).

While *Yoder* directs a rational basis review of the Forney school uniform policy, the recent case of *Troxel v. Granville*, —— U.S. ——, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), may be seen to offer an alternative view. There, in the context of child visitation rights, the Supreme Court observed that "the right of parents to make decisions concerning the care, custody, and control of their children" is a fundamental right protected by the due process clause. *Troxel*, 120 S.Ct. at 2060. The *Troxel* Court struck down a Washington statute that allowed "any person" to file a petition to seek visitation rights with a child, and such visitation may be awarded if it is in the best interest of the child. *Id.* at 2061. The plaintiffs in that case, who are the paternal grandparents of two illegitimate

children of their late son, sought visitation rights with the children. Nevertheless, the Court found the statute offensive to the parental rights of the mother, whose parental fitness was not at issue. *Id.* at 2061. The Court held that the visitation statute, which sweepingly allowed "any person" to seek visitation with a child, unconstitutionally interfered with the mother's right to make decisions concerning the care, custody, and control of her own children. *Id.* at 2065.

The broad declaration by the four-member *Troxel* plurality, that parental rights are "fundamental" liberty interests, caused other members of the Court to express concern. Justice Souter noted that the Court had "long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are *generally* protected by the Due Process clause . . . ." *Troxel,* 120 S.Ct. at 2066 (Souter, J., concurring) (emphasis added). Citing *Meyer,* Justice Souter acknowledged that the right of parents to raise their children and control their education is "protected by the Constitution." *Id.* However, he then observed that the contours of parental rights have not been fully delineated by the Court: "Our cases, it is true, have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child . . . ." *Id.* at 2066.

In his dissent, Justice Stevens remarked that the Court's decisions indicate that parents' fundamental liberty interest in caring for and guiding their children may be encroached by state action in "exceptional circumstances." *Id.* at 2071 (Stevens, J., dissenting). Furthermore, "despite this Court's repeated recognition of these significant parental liberty interests, these interests have never been seen to be without limits." *Id.*

Criticizing the plurality's expansion of the narrowly-crafted category of fundamental rights to include parental rights, Justice Scalia observed:

Only three holdings of this Court rest in whole or in part upon a substantive constitutional right of parents to direct the upbringing of their children [citing *Meyer, Pierce,* and *Yoder* ]. The sheer diversity of today's opinions persuades me that the theory of unenumerated parental rights underlying these three cases has small claim to *stare decisis* protection. . . . While I would not now overrule those earlier cases (that has not been urged), neither would I extend the theory upon which they rested to this new context.

*Troxel,* 120 S.Ct. at 2074 (Scalia, J., dissenting). Justice Scalia further forewarned that if the courts "embrace this unenumerated [parental] right . . . we will be ushering in a new regime of judicially prescribed, and federally prescribed, family law. I have no reason to believe that federal judges will be better at this than state legislatures . . . ." *Id.* at 2074–2075.

Echoing the concerns of his dissenting colleagues, Justice Kennedy urged caution in expanding the category of fundamental rights. Pointing to the cases cited by the plurality in elevating to fundamental right status the right of parents to direct the care, custody, and control of their children, Justice Kennedy stated: "The principle exists, then, in broad formulation; yet courts must use considerable restraint, including careful adherence to the incremental instruction given by the precise facts of particular cases, as they seek to give further and more precise definition to the right." *Id.* at 2076 (Kennedy, J., dissenting).

Close analysis of the *Troxel* plurality opinion reveals that, although the Supreme Court designated the parental rights at issue as fundamental, the Court conspicuously failed to articulate a standard of judicial scrutiny to be applied to laws which impinge on such rights. Indeed, the absence of a standard spurred Justice Thomas to note in his concurrence, "The opinions of the plurality, Justice Kennedy, and Justice Souter recognize such a [parental] right, but curiously none of them

articulates the appropriate standard of review." *Troxel,* 120 S.Ct. at 2068 (Thomas, J., concurring).

In *Troxel,* the plurality cited several cases concerning parental rights in arriving at the general conclusion that parental rights are fundamental. The *Troxel* plurality points to the following cases in support of its conclusion: *Meyer,* 262 U.S. at 399, 43 S.Ct. 625 (involving the right to be taught a foreign language); *Pierce,* 268 U.S. at 534–535, 45 S.Ct. 571 (concerning the right of parents to send their children to a private school); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (upholding a state child labor law which prohibited children from selling magazines in the street or other public place); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (invalidating a state statute which automatically allowed the state to assume custody of a child whose mother died, without allowing the unwed father to assert parental rights); *Yoder,* 406 U.S. at 232, 92 S.Ct. 1526 (striking down a compulsory education law which required all children to attend school until age sixteen); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (holding that the "best interest of the child" evidentiary standard is all that is required in a child adoption proceeding); *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (upholding a state statute authorizing parents to commit their children to mental institutions without the child's consent); *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that due process requires that proceedings to terminate parental rights must utilize the "clear and convincing" evidentiary standard of proof); *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258 (holding that terminally ill patients do not have a fundamental liberty interest in committing suicide).

Clearly, only three of the foregoing cases cited by the *Troxel* plurality implicate parental rights in the context of public education: the *Meyer, Pierce,* and *Yoder*

trilogy. The Supreme Court did not apply heightened scrutiny to the challenged governmental interference in either *Meyer* or *Pierce.* Further, with respect to the parental rights claim alone (without the benefit of a free exercise claim), the *Yoder* Court indicated that rational basis scrutiny was appropriate. *See Meyer,* 262 U.S. at 399–400, 43 S.Ct. 625 (the state interference must not be "arbitrary or without reasonable relation to some purpose within the competency of the state to effect."); *Pierce,* 268 U.S. at 534–535, 45 S.Ct. 571 (same); and *Yoder,* 406 U.S. at 215, 92 S.Ct. 1526 ("A way of life ... may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations."). Thus, for that line of Supreme Court jurisprudence concerning parental rights and their relationship with public educational interests, the Supreme Court has directed a rational basis review.

This Court recognizes, however, that both *Meyer* and *Pierce* were decided before the Supreme Court articulated its three-tier scrutiny method of analysis. *See San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (noting that earlier cases employed the "traditional" standard of scrutiny). The application of strict judicial scrutiny to state action was first mentioned in Justice Harlan's dissent in *Poe v. Ullman,* 367 U.S. 497, 548, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). Furthermore, it was not explicitly adopted by the Court until 1971. *See Graham v. Richardson,* 403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *see also Herndon,* 89 F.3d at 177–179 (discussing the evolution of the three-level scrutiny model in the context of parental rights).

 Notwithstanding that *Meyer* and *Pierce* were decided before the inauguration of the present hierarchical scrutiny scheme, *Yoder* was handed down after the Supreme Court adopted the strict scrutiny analysis normally applied to fundamental rights—but, notably, the *Yoder* Court did

not call for strict scrutiny of reasonable educational regulations to which parents assert secular claims of parental rights. *Yoder*, 406 U.S. at 215, 92 S.Ct. 1526. It is clear, therefore, that rational basis scrutiny applies in parental rights cases where the interests of the state in promoting education are also present.

The Supreme Court has stated that the due process clause "forbids the government to infringe *certain* 'fundamental' liberty interests at all ... unless the infringement is narrowly tailored to serve a compelling state interest." *Flores*, 507 U.S. at 301–302, 113 S.Ct. 1439 (emphasis added) (citing *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *see also Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258 (stating that the due process clause "provides heightened protection against government interference with *certain* fundamental rights and liberty interests.") (emphasis added). Thus, it is clear that government interference with *certain* fundamental liberty interests warrants a heightened level of judicial scrutiny. Furthermore, *Yoder* is authority for the proposition that some fundamental rights, depending on their character and the context in which they are asserted, may warrant either rational basis scrutiny or something more than that.

This Court, then, is left with the *Meyer/Pierce/Yoder* line of Supreme Court precedent on the one hand, and the recent *Troxel* decision on the other. Clearly, *Yoder* and its antecedents are more relevant than *Troxel* and the line of unrelated parental rights cases it relied upon to elevate such rights to fundamental status. The fundamental right of filiation and companionship with one's children, which the Supreme Court examined in *Troxel*, is an entirely different balance of interests from the right of parents to send their children to a public school in clothes of their own choosing. The Supreme Court has characterized the interest of the state and local authorities in providing its citizens with public education as the "very apex of the function of a State." *Yoder*, 406 U.S. at 213, 92 S.Ct. 1526. Therefore, in the context of public educational interests, the parental right to control the upbringing and education of one's children is more properly decided under *Yoder*, rather than *Troxel*.

Thus, while there appears to be some inconsistency between *Troxel* and *Yoder*, the Supreme Court's decision in *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), resolves any perceived tension. There, the Court acknowledged that its earlier First Amendment establishment clause law had been modified by later rulings. *Id.* at 237, 117 S.Ct. 1997. However, the Court warned that earlier decisions by the Court remain viable until such time as they are expressly abrogated by the Court:

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Id.* (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Thus, because *Yoder* has direct application to this case, this Court must employ the reasoning of that decision to decide the instant case, notwithstanding the more general pronouncements of *Troxel*.

Contrary to Plaintiffs' suggestion, it would be disingenuous and utter folly for this Court to simply group together all liberty interests involving parents and their children, despite the context in which they are invoked, place them under the rubric of "fundamental rights," and *ipso facto* apply strict scrutiny to the particular

governmental intrusion. Parental rights do not exist in a vacuum; rather, their exercise depends on the circumstances out of which they arise. Hence, the competing interests are balanced. The Supreme Court has clearly stated that lower courts must give a "careful description of the asserted fundamental liberty interest," *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258, because "neither the rights of religion nor rights of parenthood are beyond limitation." *Prince,* 321 U.S. at 166, 64 S.Ct. 438. The *Prince* Court further observed that "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and ... this includes, to some extent, matters of conscience and religious conviction." *Id.* at 167, 64 S.Ct. 438; *see also Runyon,* 427 U.S. at 178, 96 S.Ct. 2586 (stressing that parents "have no constitutional right to provide their children with private [or public] school education unfettered by reasonable government regulation.").

■ Accordingly, this Court applies the principles of *Yoder* to the instant case. Plaintiff parents' due process claim, therefore, is subject only to rational basis scrutiny. *See Herndon,* 89 F.3d at 179; *Immediato,* 73 F.3d at 462. As such, the school uniform policy passes constitutional muster. The Court has previously concluded that the School Board's interest in furthering education is not only compelling, but paramount. *See Ferrell,* 392 F.2d at 703. The uniform policy is a measure directed toward that end. Clearly then, the policy easily meets the rational basis test. Therefore, it does not unconstitutionally inhibit Plaintiff parents' due process right to direct the upbringing and education of their children. The School Board is entitled to judgment as a matter of law as to those claims.

### RELIGION RIGHTS

The First Amendment religion clauses provide in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." These commandments are applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Plaintiffs contend that the school uniform policy unconstitutionally inhibits their right to freely exercise their religious beliefs, namely, the right to determine the clothing worn by their children at school, in accordance with their respective religious beliefs.[8] They also allege that the questionnaire and grievance procedure establishes a preference for a particular religion, in violation of the establishment clause.

#### Free Exercise Clause

■ The free exercise of religion clause of the First Amendment affords absolute protection to religious beliefs. *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The clause also extends, to a limited extent, to conduct based upon religious beliefs. *Id.* at 877–878, 110 S.Ct. 1595. The Supreme Court observed, "Our cases have long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute." *Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). In defining the limits of protection afforded by that constitutional provision, the Supreme Court explained that the free exercise clause "holds an important place in our scheme of ordered

---

**8.** Only twelve of the named Plaintiffs allege that the Forney uniform policy violates their free exercise rights: Virginia McLaren and her daughter Natalie Johnson; Mary Penn and her children, Haley Penn, Lynzi Anderson, and Drew Anderson; William Tapley and Norma Tapley, and their daughter Kaytie Tapley; and, David Lowery and Vinita Lowery, and their daughter Madeline Lowery. However, the Lowerys were granted an exemption from the uniform policy and McLaren removed her daughter, Natalie, from the Forney I.S.D.

liberty, but the Court has steadfastly maintained that claims of religious conviction do not automatically entitle a person to fix unilaterally the conditions and terms of dealings with the Government. Not all burdens on religion are unconstitutional." *Id.* at 702, 106 S.Ct. 2147.

In *Smith,* the Supreme Court held that facially neutral, generally applicable laws which incidentally burden religiously motivated conduct are not subject to strict scrutiny analysis. *Smith,* 494 U.S. at 885, 110 S.Ct. 1595. In doing so, the Court abrogated its earlier decision in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and its progeny, which applied strict scrutiny to governmental action which imposed a burden on religious conduct. Therefore, a neutral, generally applicable governmental regulation will withstand a free exercise challenge when it is reasonably related to a legitimate state interest. *See Diaz v. Collins,* 114 F.3d 69, 71 (5th Cir.1997) (noting that *Smith* lowered the level of scrutiny to rational basis); *Munn v. Algee,* 924 F.2d 568, 574 (5th Cir.1991) (applying *Smith* in a civil case).

In the instant case, there is no evidence to suggest that the Forney school uniform policy is not facially neutral or generally applicable. The evidence clearly reveals that the policy was not enacted for the purpose of inhibiting any religious belief or practice. The only reference in the policy to religion is the opt-out provision, which obviously is an attempt to accommodate, not hinder, the religious beliefs of the students and their parents. Clearly then, the policy was not adopted "because of" Plaintiffs' beliefs, but "in spite of" them. *See Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279 n. 24, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 540, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Accordingly, *Smith* points to the validity of the uniform policy.

Plaintiffs argue, however, that *Smith* left open the door to strict scrutiny analysis in cases where the rights asserted derive not only from the free exercise clause, but also from due process clause protection of parental rights, discussed above. Plaintiff's argument springs from language in *Smith* which indicated that a more demanding level of judicial scrutiny would apply in circumstances where the a free exercise claim is combined with a parental rights claim. *Smith,* 494 U.S. at 881, 110 S.Ct. 1595. The Court referred to such a situation as a "hybrid." *Id.* at 882, 110 S.Ct. 1595. Plaintiffs suggest that in situations where hybrid rights are presented, strict scrutiny is demanded. However, Plaintiffs' argument is a product of a misreading of *Smith.*

The unambiguous holding in *Smith* is that strict scrutiny analysis is inapplicable to neutral, generally applicable governmental regulations which place an incidental burden on religious practices. *Smith,* 494 U.S. at 885, 110 S.Ct. 1595. Nevertheless, in order to distinguish *Yoder,* rather than overrule it, the *Smith* Court observed that it was not presented with a hybrid situation such as that found in *Yoder,* which involved free exercise rights and parental rights. *Smith,* 494 U.S. at 881–882, 110 S.Ct. 1595. Thus, in reducing the scrutiny level from strict to rational basis, the *Smith* decision left *Yoder's* standard of review intact. Contrary to Plaintiffs' assertion, *Smith* does not articulate any standard of scrutiny—in the hybrid situation or otherwise. The perplexing notion of hybrid rights was discussed in Justice Souter's concurrence in *Lukumi,* 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring):

> [T]he distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith,* since free speech and associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a

litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all.

While there is no Fifth Circuit jurisprudence on the subject of hybrid rights,[9] other courts have required more than the mere allegation of a hybrid rights violation. In *Swanson v. Guthrie Ind. School Dist.*, 135 F.3d 694, 700 (10th Cir.1998), the court concluded that the plaintiffs could not avail themselves of the hybrid right exception because they had not established a colorable claim of infringement of a parental right. There, a parent home-schooled her child for religious reasons. When the parent attempted to enroll her child part-time in a public school, she was denied. The parent claimed violations of her free exercise rights and her parental rights. In concluding that the parent had not shown a colorable parental right claim, the court stated:

> At a minimum . . . it cannot be true that a plaintiff can simply invoke the parental rights doctrine, combine it with a claimed free-exercise right, and thereby force the government to demonstrate the presence of a compelling state interest. Whatever the *Smith* hybrid-rights theory may ultimately mean, we believe that it at least requires a colorable showing of infringement of recognized and specific constitutional rights, rather than the mere invocation of a general right such as the right to control the education of one's child.

*Swanson*, 135 F.3d at 700. The Ninth Circuit has also adopted the "colorable claim" view of hybrid rights. *Miller v. Reed*, 176 F.3d 1202, 1208 (9th Cir.1999) (holding that a plaintiff does not allege a

hybrid rights claim, and thus he is not entitled to strict scrutiny of the offending regulation, merely by combining a meritless claim of the violation of another alleged fundamental right or a claim of an alleged non-fundamental right).

Likewise, the First Circuit Court of Appeals has also required that the nature and quality of the hybrid claims must implicate the threshold set by *Yoder. Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996). The court explained:

> We find that the plaintiffs' allegations do not bring them within the sweep of *Yoder* for two distinct reasons. First, as we explained, the plaintiffs' allegations of interference with family relations and parental prerogatives do not state a privacy or substantive due process claim. Their free exercise challenge is thus not conjoined with an independently protected constitutional protection. Second, their free exercise claim is qualitatively distinguishable from that alleged in *Yoder*.

*Brown*, 68 F.3d at 539.

The Sixth Circuit, however, has taken a different approach to the hybrid rights theory—it has refused to apply it. In *Kissinger v. Bd. of Trustees of Ohio State University*, 5 F.3d 177 (1993), the court bluntly stated the paradox presented by the hybrid rights principle:

> We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the Free Exercise Clause if it did not implicate other constitutional rights. . . . [T]he *Smith* Court did not explain how the standards under the Free Exercise Clause would change depending on whether other constitutional rights are implicated.

---

**9.** In *Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1216 (5th Cir.1991), the Fifth Circuit touched on "religion-plus-speech;" however, that opinion was withdrawn on rehearing *en banc*, 959 F.2d 1283 (5th Cir.1992) (holding that the plaintiffs lacked standing without reaching the underlying merits).

*Kissinger,* 5 F.3d at 180. Moreover, the court stated that it would be "completely illogical" to hold that the legal standard under the free exercise clause should be dependent on whether a free exercise claim is coupled with another constitutional claim:

> [T]herefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard than that used in *Smith* to evaluate generally applicable, exceptionless state regulations under the Free Exercise Clause.

*Id.*

Plaintiffs rely instead on *Hicks v. Halifax Co. Bd. of Ed.,* 93 F.Supp.2d 649 (E.D.N.C.1999), in support of their assertion that the hybrid rights analysis applies to the instant case. There, the school board adopted a school uniform policy, to which the plaintiff objected on religious grounds. The policy did not contain an opt-out provision for religious objectors, unlike the present case. The plaintiff filed suit, claiming an infringement of her free exercise rights and parental rights. The *Hicks* court examined the *Smith* decision in some detail and concluded that the mere allegation of a free exercise claim and a parental rights claim is sufficient to state a hybrid rights claim and thereby invoke strict scrutiny analysis. *Hicks,* 93 F.Supp.2d at 662. However, the court then stated that "the presence of the interest, as a genuine claim, supported by evidence in the record" triggered heightened scrutiny. *Id.*

■ This Court adopts the reasoning of the First, Sixth, Ninth, and Tenth Circuits. In keeping with the purpose and scope of *Smith,* it is clear that Plaintiffs cannot merely allege the violation of several constitutional rights, link them to a free exercise claim, and thereby invoke the demanding strict scrutiny standard. Whether they attach to their free exercise claim a parental rights claim or a free speech claim, the result is the same.[10] Such bootstrapping cannot be inferred from *Smith.* Indeed the *Smith* Court looked with disfavor on the application of heightened scrutiny to free exercise claims. "[W]e cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order." *Smith,* 494 U.S. at 888, 110 S.Ct. 1595. It must be kept in mind that *Smith* is the general rule, and exceptions will not be easily found. The *Smith* Court noted that the application of strict scrutiny to all regulations which touch upon religion will undermine its efficacy in other areas:

> If the "compelling interest" test is to be applied at all, then, it must be applied across the board, to all actions thought to be religiously commanded. Moreover, if "compelling interest" really means what it says (and watering it down here would subvert its rigor in the other fields where it is applied), many laws will not meet the test. Any society adopting such a system would be courting anarchy . . . .

*Smith,* 494 U.S. at 888, 110 S.Ct. 1595.

In the present case, the Forney school uniform policy requirements are qualitatively and, indeed, substantially different from the claims considered in *Yoder.* There, the Supreme Court went to great lengths to examine the "quality of the claims" presented. *Yoder,* 406 U.S. at 215, 92 S.Ct. 1526. The Court explained that the compulsory school attendance law at issue there would "substantially" interfere with the "fundamental" tenets of the Amish, which have been practiced by the sect unchanged for three hundred years. *Id.* at 217–219, 92 S.Ct. 1526. The law carried

---

10. Plaintiff students' free speech claim was found to be lacking the primary element of communication and, thus, unprotected by the First Amendment. Therefore, Plaintiff students' free exercise claim cannot be subject to heightened scrutiny on the basis of their free speech claim, which does not meet the constitutional definition of "speech."

the threat of "undermining the Amish community." The Court further observed that there was "strong evidence" in the record of a "sustained faith pervading and regulating respondents' entire mode of life." *Id.* at 219, 92 S.Ct. 1526. In the *Yoder* Court's mind, the Amish parents had made a "convincing showing, one that probably few other religious groups or sects could make ...." *Id.* at 235–236, 92 S.Ct. 1526. Based on the substantial showing that the compulsory attendance law would entirely undermine the very core of the Amish faith, the Court observed that "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement ...." *Id.* at 233, 92 S.Ct. 1526.

■ The quality of Plaintiffs' free exercise claims do not present the type of claims that would implicate a "more than" rational basis level of scrutiny, such as that utilized in *Yoder.* Whatever the basis of their religious objection, those Plaintiffs who object to the school uniform policy for that reason have not demonstrated that the policy will impact their religious practices in any appreciable manner, and certainly not to the degree of interference in *Yoder.* Plaintiffs simply contend that the uniform policy is contrary to their religious faith, but do not indicate how the wearing of a school uniform, as contrasted with other clothing, would affect their faith or their practices. As the Supreme Court clearly stated, "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith,* 494 U.S. at 878–879, 110 S.Ct. 1595.

■ However characterized—whether by falling within the general scope of *Smith* as a neutral, generally applicable regulation, or by failing to meet the requirements of *Yoder*—the Forney school uniform policy meets rational basis scrutiny and, indeed, the School Board has demonstrated that the policy is "more than merely a reasonable relation" to a legitimate interest in education. As earlier noted, it is a reasonable means to effect the compelling interest in furthering important educational goals.

■ Plaintiffs next argue that the questionnaire and the grievance procedure denied their rights of free exercise of religion. Essentially, Plaintiffs complain that during the grievance procedure in which their exemption requests were denied, the School Board impermissibly passed judgment on Plaintiffs' religious beliefs. Plaintiffs' claims are meritless. Initially, the Court notes again that Plaintiffs do not contest the procedures employed by the School Board in the grievance process. Furthermore, it is clear that the School Board can inquire into the sincerity of Plaintiffs' beliefs. *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 693, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (stating that, "under the First Amendment, the IRS can reject otherwise valid claims of religious benefit only on the ground that a taxpayers' [*sic*] alleged beliefs are not sincerely held."). Under TEX. EDUC. CODE ANN. § 11.162, which Plaintiffs do not contest, the School Board is required to exempt only those persons with *bona fide* objections. There is no other method by which to determine whether Plaintiffs' objections are sincere, except through inquiry by persons charged with effectuating the policy. Moreover, there is no evidence to establish that the School Board or its designees specifically considered the veracity of Plaintiffs' beliefs or, if known, that it influenced their denial of Plaintiffs' exemption request. Drawing all inferences in Plaintiffs' favor, it is clear that the religious exemption requests were denied, not on the basis of a particular stated faith, but on the fact that the students had worn other types of uniforms in the past and did not indicate why they objected to the

school uniform clothing, or their parents did not bother to explain their objection.

Accordingly, there is no genuine issue of material fact as to whether the Forney school uniform policy violated their rights of free exercise of religion, and the School Board is entitled to judgment as a matter of law.

### Establishment Clause

■■■ The establishment clause of the First Amendment prohibits the government from promoting or affiliating itself with any religious doctrine or organization, discriminating against persons on the basis of their religious beliefs or practices, delegating a governmental power to a religious institution, or entangling itself in a religious institution's affairs. *County of Allegheny v. ACLU,* 492 U.S. 573, 590–591, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). The Supreme Court has fashioned a three-part inquiry to determine whether a particular governmental action does not offend the establishment clause: first, the statute or regulation must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; third, the statute or regulation must not foster an excessive entanglement with religion. *Wallace v. Jaffree,* 472 U.S. 38, 55–56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). Thus, "[e]ach value judgment under the Religion Clauses must therefore turn on whether [the] particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so." *Walz v. Tax Comm'n of City of New York,* 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

The gravamen of Plaintiffs' establishment clause claim is that the School Board arbitrarily granted opt-out requests for those students whose religious beliefs the School Board agreed with. However, Plaintiffs candidly admit that they have no knowledge concerning the School Board's consideration and disposition of the exemption requests of others and, again, they do not contest the grievance procedures.

Nevertheless, the Court concludes that neither the uniform policy nor the opt-out procedure violates the establishment clause.

■■■ The fundamental consideration is whether the School Board discriminated against or preferred a particular religious group or philosophy. Here, the uniform policy unquestionably has a secular purpose. Next, the principal effect neither advances nor inhibits religion. Its purpose is to enhance the learning environment in the Forney schools, irrespective of the religious faith of a particular student. Finally, the policy does not unnecessarily entangle the School Board with religion. The uniform policy references religion only in the context of exemptions. There is no evidence to suggest that as a result of the uniform policy, the School Board must routinely or even occasionally become involved in religious matters. Less than one hundred exemption requests, out of nearly 2,500 students, were considered by the School Board, and the vast majority concerned secular opt-out requests. Therefore, there is an absence of material fact as to Plaintiffs' establishment clause claims. The School Board is accordingly entitled to judgment as a matter of law.

### EQUAL PROTECTION

■■■ The equal protection clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Simply stated, that provision commands that all persons similarly situated should be treated alike. *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Generally, a statute is presumed to be valid and will be upheld if the classification established by the statute is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. 3249. When social or economic legislation is at issue, the equal protection clause allows states wide discretion, for the Constitution pre-

sumes that improvident legislation will be ultimately cured through the political process. *Id.* However, where classifications are based on race, alienage or national origin, or where the legislation impinges on fundamental rights, such legislation is subject to heightened scrutiny. *Id.*

With the exception of the allegation in their complaint, Plaintiffs have not suggested, much less argued a colorable equal protection claim. The complaint merely alleges that the School Board has created an arbitrary class: students and parents residing in the Forney I.S.D. The Court notes that the School Boards' authority extends only to the boundaries of the Forney I.S.D., wherein Plaintiffs reside. Clearly, if all students and parents within the Forney I.S.D. are the same persons singled out for similar disparate treatment, then by definition there can be no inequality in treatment.

This Court may enter summary judgment on its own motion if the parties are on notice to come forward with all of their evidence. *Celotex,* 477 U.S. at 326, 106 S.Ct. 2548. The Court may also dismiss claims on its own motion under FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted, "as long as the procedure employed is fair." *Bazrowx v. Scott,* 136 F.3d 1053, 1054 (5th Cir.1998). In the instant case, Plaintiffs' equal protection claim obviously lacks merit and they have had ample opportunity to address that claim. Thus, under these circumstances it would not be unfair to dismiss it. Therefore, the Court will dismiss the equal protection claim.

*QUALIFIED IMMUNITY*

██ When the defense of qualified immunity is asserted against a claim under 42 U.S.C. § 1983, the initial inquiry is whether a constitutional violation has occurred. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). However, since the Court has concluded that no constitutional violations occurred in this case, the issue of qualified immunity is moot. *Saenz v. Heldenfels Bros., Inc.,* 183 F.3d 389, 392 (5th Cir.1999).

It is therefore **ORDERED** that Defendants' Motion for Summary Judgment, filed on June 5, 2000, by Defendants Forney Independent School District, Keith Bell, Kenneth Cleaver, Clarence Doggan, Jay Calvin, Jim Jacobs, Rick Townsend, David Walker, and Chester J. St. Clair, is **granted.**

It is **FURTHER ORDERED** that the two Motions to Dismiss Pursuant to Rule 12(b)(6), filed on May 31, 2000, by Defendants Forney Independent School District, Keith Bell, Kenneth Cleaver, Clarence Doggan, Jay Calvin, Jim Jacobs, Rick Townsend, David Walker, and Chester J. St. Clair, are both denied as **moot.**